Richmond

ECCON CONSTRUCTION COMPANY AND
AETNA CASUALTY & SURETY COMPANY

v.

LILLIE MAE LUCAS

January 16, 1981.

Record No. 800435.

Present: All the Justices.

*R. Craig Jennings* (*Slenker, Brandt, Jennings and Johnston,* on brief), for appellants.

*Carroll E. Smith* (*Woodbridge, Smith, Scott, Van Lear & Bass,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

Eccon Construction Company, Inc., and its insurer, Aetna Casualty & Surety Company (collectively, the employer), appeal from an Industrial Commission order awarding workmen's compensation death benefits to the claimant, Lillie Mae Lucas, widow of Newton Lucas, Jr. Raising two questions, the employer first contends that the evidence fails to prove the occurrence of an industrial accident.

On the morning of October 24, 1978, Lucas, a carpenter, reported for work at a construction site near Fort Belvoir. A fellow worker noticed that he was limping. At the lunch hour, Lucas descended a ladder from the roof where he had been working, went to his car, and drove to The Pratt Clinic, Ltd., in Fredericksburg where he was examined by Dr. David B. Rice. Finding symptoms of "deep vein thrombophlebitis in the right leg", Dr. Rice recommended hospitaliza-

tion. After driving home for a bath, Lucas entered Mary Washington Hospital. He was discharged November 4, readmitted November 7, and transferred November 15 to Medical College of Virginia. Following surgery later that day, he expired. The death certificate showed that the "immediate cause" of death was "cardiac arrest due to massive pulmonary embolism" and that the "underlying cause" was "Deep vein thrombosis, rt. femoral".

The job superintendent testified that he and Lucas had been working together on the roof; that he had followed Lucas down the ladder at noon; that Lucas had said nothing about an accident or injury; and that he had learned nothing until he read a letter dated November 22, 1978, addressed to the employer by an attorney. Lucas's widow, mother, and daughter and one of his neighbors testified that Lucas had told them that he had "struck his leg" or "hurt his leg" at work but had not explained the circumstances. The claimant further testified that her husband had told her that he had asked a co-worker to advise the superintendent that "he had to leave and see a doctor on account of his leg was hurting."

According to the October 24, 1978, entry in the records of Pratt Clinic, Lucas had complained that "My glands swell up on me for 2 wks". That entry made no reference to an accident. Another entry made January 23, 1979, stated: "His widow came in to discuss the possible relationship of his having taken a hard blow on his affected thrombophlebitic leg just a day or so prior to his coming to the hospital. Apparently, because he had had other symptoms of the leg for a couple of weeks he did not really mention this injury at first—only mentioned it when I saw him in the hospital later."

The employer argues that "without any evidence of how, when, where and why the accident happened, it would be rank speculation to conclude that the event 'arose out of' the employment." We do not decide whether the evidence supports the Commission's conclusion that the decedent suffered an injury from an industrial accident. For purposes of this opinion only, we will assume the affirmative and address the alternative question raised by the employer: Does the evidence support the Commission's finding of a causal connection between the injury and the death?

> "[C]ausal connection is established when it is shown that an employee has received a compensable injury which materially aggravates or accelerates a pre-existing latent disease which becomes the direct and immediate cause of death."

*Liberty Mutual Ins. Co.* v. *Money,* 174 Va. 50, 57, 4 S.E.2d 739, 741 (1939).

The parties agree that Lucas had been suffering from a "pre-existing latent disease". According to the "final summary" of his first hospitalization, he had been "having some on and off aching and swelling in his leg for a month or more" and had suffered "more discomfort in his right leg the preceding week before admission."

The claimant's position is that "the accidental injury materially aggravated or accelerated the pre-existing phlebitic condition of Lucas's right leg which led to the immediate cause of death." We consider first whether the evidence establishes aggravation. There was no evidence, lay or expert, concerning the nature or extent of the blow to Lucas's leg. In reply to a letter from the claimant's attorney, Dr. Rice reported that it was "impossible to estimate the percentage effect which the more recent trauma caused to an apparently already abnormal and probably already active phlebitic leg." While he said that "trauma could very possibly set off a chain of thrombophlebitic problems" and that the trauma described by the attorney "was of real significance", he added that "if [Lucas] was so stoic as to tolerate this sort of leg condition for this period of time, then, if the trauma had not occurred, he would not have sought medical attention and he may well have died at home in a much shorter period of time without any hospitalization."

Dr. Rice's comments concerning the potential effects of a trauma upon pre-existing thrombophlebitis presuppose a trauma sufficiently severe to produce pathological consequences. But he does not say that the injury Lucas received was such a trauma. And the records of the Clinic and those of Mary Washington Hospital tend to show otherwise. Although the right leg was the focus of the examination, none of those records, all apparently dictated by Dr. Rice, made any mention of the existence of an abrasion or contusion. The "final summary" following the November 4 discharge noted that Lucas had "made regular progress although at first it was rapid and then more slow". After discharge, he "was seen in follow up in the Clinic and continued to do well, although not entirely cleared." During his second hospitalization, "[h]e continued to improve with the pain going away and having no respiratory symptoms. He had been doing quite well and in fact was pushing for more activity when he was found in severely ill state about 9:45 on 11/15/78".

Notwithstanding such evidence, we will assume that the blow to Lucas's leg caused some degree of aggravation of his pre-existing

disease. We must now determine whether there was evidence to support the Commission's implicit finding that it was sufficiently material to have become "the direct and immediate cause of death." *Id.*

The Commission's factual findings are "conclusive and binding", Code § 65.1-98, and a question raised by "conflicting expert medical opinions" is "one of fact". *Johnson* v. *Capitol Hotel,* 189 Va. 585, 590, 54 S.E.2d 106, 109 (1949). *See also C.D.S. Services* v. *Petrock,* 218 Va. 1064, 243 S.E.2d 236 (1978). But where there is "no conflict in the evidence, the question of the sufficiency thereof is one of law." *City of Norfolk* v. *Bennett,* 205 Va. 877, 880, 140 S.E.2d 655, 657 (1965).

There is no significant conflict in the expert medical opinions of the two doctors who attended Lucas, and "we must inquire to determine if the correct legal conclusion has been reached." *Id.*

Dr. Lazar J. Greenfield described the operation at Medical College of Virginia. A "catheter was passed into the pulmonary artery". An autopsy "confirmed the fact that [Lucas] had sustained a massive embolus during the procedure". Dr. Greenfield felt that the characteristics of the embolus indicated that it had not arisen from the leg but "from the right heart" and that "[i]t is possible that our catheter manipulation provoked such further embolization". In a letter to the claimant's attorney, Dr. Greenfield said that the "embolism . . . may be a consequence of injury or immobilization" and that "there may be a relationship to the injury you describe". Replying to a similar letter requesting any "information you could add which I could offer as proof of causal relationship", Dr. Rice said that "we cannot say even with the post mortum (sic) examination what was the source of the final fatal embolus; however, we have no doubt but what his morbid condition at that time was caused by the thrombophlebitic process in the right lower extremity." Significantly, as we have noted, Dr. Rice did not say that the thrombophlebitic process was aggravated by the trauma described in the attorney's letter or that any such aggravation was causally related to Lucas's morbid condition.

In summary, one of the attending physicians believed that a trauma such as the claimant's attorney described "could very possibly" aggravate a thrombophlebitic condition. The other felt that the fatal embolism "may" have resulted from such a trauma, but that it "may" have resulted from "immobilization", and that, since the post mortem examination indicated that the embolus arose from

the heart rather than the leg, it might have resulted from "our catheter manipulation".

At most, the medical evidence adduced by the claimant raises a purely theoretical possibility of aggravation and causal connection.\* But, as we said in a case where the question was whether the evidence was sufficient to prove that a cerebral hemorrhage had resulted from heavy lifting, "[p]ossibility is not enough." *Rust Engineering Co.* v. *Ramsey,* 194 Va. 975, 979, 76 S.E.2d 195, 198 (1953).

> "We have frequently pointed out that a claimant must prove a causal connection between the accident and the disability which he claims resulted therefrom. 'This proof must go beyond conjecture. If the evidence shows that it is just as probable that the disability resulted from a cause which is not compensable, as it is that it resulted from one which is compensable, the claimant has not sustained the burden of proof.' (Citations omitted)."

*Southall, Adm'r* v. *Reams, Inc.,* 198 Va. 545, 548-49, 95 S.E.2d 145, 147-48 (1956).

We hold that the claimant has not sustained the burden of proving causal connection, and the award will be reversed and the claim dismissed.

*Reversed and dismissed.*

---

\* In a letter introduced by the employer, Dr. John J. Nolan concluded from his review of the records that this "is a case of spontaneous progressive, thrombophlebitis and thromboembolism, inadequately treated prior to the time of [Lucas's] death . . . and having no demonstrable relationship to an alleged injury at work."

See *Colonna's Shipyard* v. *O'Hearne,* 200 F.2d 220 (4th Cir. 1952), where the court reversed a federal compensation award because the finding of causal connection between an ankle injury and a thrombus which required amputation of a leg was not supported by substantial evidence.