## Norfolk

### GUILFORD STANCILL, SR.

### v.

### FORD MOTOR COMPANY

No. 1941-91-1

Decided September 1, 1992

Counsel

John H. Klein (Rutter & Montagna, on brief), for appellant.

Barry Dorans (Samuel W. Meekins, Jr.; Wolcott, Rivers, Wheary, Basnight & Kelly, on brief), for appellee.

Opinion

**COLEMAN, J.**—Guilford Stancill, Sr., appeals the Workers' Compensation Commission decision denying his application for compensation benefits based on his claim that he had developed an "occupational disease." Stancill contends that the commission erred in finding the evidence insufficient to prove that he had sustained an occupational disease and, in doing so, the commission either disregarded or failed to consider uncontradicted credible evidence. As cross-error, Ford Motor Company (Ford) contends that the commission erred by using an incorrect legal standard in deciding that a rotator cuff tear can be an occupational disease, rather than an ordinary disease of life, and in failing to find that Stancill had a preexisting, noncompensable condition that had been aggravated by, but not caused by, his employment. We hold that the uncontradicted credible evidence is contrary to the

commission's factual findings, which were the basis for its determination that Stancill failed to bear his burden of proving a causal connection between workplace activity and the rotator cuff tear. Thus, the commission's findings are not supported by credible evidence. Consequently, we reverse and remand the claim with directions. Our opinion necessarily addresses the employer's questions raised by cross-appeal.

Guilford Stancill, Sr., was employed by Ford as a welder on its truck assembly line. Stancill's job required him to spot-weld three places on the left side of truck beds using equipment suspended from overhead tracks. From time to time, he was required to spot-weld other designated places on the truck that robots missed. Stancill was also required to affix six steel spring clips onto a steel plate, which was a component part of each truck. He placed the six clips on between forty and forty-seven plates per hour. Beginning in March 1990, Stancill began experiencing pain in his left shoulder and side which grew worse in May or June. When he returned from a vacation in early July 1990, he consulted Dr. Edward Habeeb, who opined that Stancill might be suffering from some shoulder pathology. Dr. Habeeb restricted Stancill's work as of July 10, 1990, pending the determination and treatment of his medical problem. Dr. Habeeb referred Stancill to Dr. Pat L. Aulicino. Dr. Aulicino first examined Stancill on August 6, 1990, in regard to his left shoulder. Aulicino diagnosed Stancill as suffering from subacromial bursitis of the left shoulder, with a possible left rotator cuff tear and radial tunnel syndrome. On August 27, 1990, Dr. Aulicino performed an arthroscopic examination upon Stancill, which confirmed that he had a rotator cuff tear. Dr. Aulicino surgically repaired the shoulder on October 2, 1990. When Dr. Aulicino repaired the rotator cuff, he believed that Stancill's condition was caused by the work that Stancill did on his job with Ford.

On October 19, 1990, Stancill filed a claim with the Workers' Compensation Commission for temporary total benefits, alleging that he had developed a rotator cuff tear that constituted an occupational disease as defined by Code § 65.2-400[1] (formerly Code § 65.1-46). Deputy Commissioner Dely heard the claim and found that Stancill, who had "presented himself as a very credible witness," had sustained a

---

[1] Code § 65.2-400 sets forth the definition of "occupational disease" as follows:

§ 65.2-400. "Occupational disease" defined.—A. As used in this title, unless the context clearly indicates otherwise, the term "occupational disease" means a disease arising out of and in the course of employment, but not an ordinary disease of life to which the general public is exposed outside of the employment.

left rotator cuff tear that was directly caused by the cumulative trauma associated with performing his work. Dely found no evidence of any contributing cause outside work. The deputy commissioner held that Stancill had proven that the rotator cuff tear was a compensable occupational disease. The commission reversed. In doing so, the commission did not disagree that a rotator cuff tear may be an occupational disease, but it found the evidence insufficient to establish a causal relationship between Stancill's work activity and the rotator cuff tear. The commission ruled that the medical evidence did not establish that Stancill's rotator cuff tear had its origin in a risk connected with the employment.

 Stancill contends that the commission erred as a matter of law in finding the evidence insufficient to prove that his rotator cuff tear arose out of his employment within the meaning of Code § 65.2-400. He asserts that the commission's ruling that no credible evidence exists to prove that the rotator cuff tear was caused by the employment is based upon a misperception of the evidence. We agree. Generally, a ruling by the commission that the claimant's evidence is insufficient to prove that an injury was causally related to the employment must be upheld on appeal because the question is one of causation, which is a factual determination frequently turning upon the weight and credibility accorded to the evidence. Code § 65.2-706(A); *Island Creek Coal Co. v. Breeding*, 6 Va. App. 1, 12, 365 S.E.2d 782, 788 (1988). Here, however, the commission misperceived the basis for the medical evidence and based its holding on an erroneous factual finding that the doctor's opinion was not based upon his having knowledge of the physical activity and requirements for Stancill to perform his work. The misperception of the evidence was critical to the commission's

B. A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind, upon consideration of all the circumstances:

1. A direct causal connection between the conditions under which work is performed and the occupational disease;

2. It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;

3. It can be fairly traced to the employment as the proximate cause;

4. It is neither a disease to which an employee may have had substantial exposure outside of the employment, nor any condition of the neck, back or spinal column;

5. It is incidental to the character of the business and not independent of the relation of employer or employee; and

6. It had its origin in a risk connected with the employment and flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

holding that the claimant had failed to establish that his condition was caused by his employment. Thus, we reverse the commission. The uncontradicted medical evidence proved that the nature of the work that Stancill performed — the repetitive trauma to the shoulder associated with welding and affixing the clips — was the direct proximate cause of Stancill's rotator cuff tear. Therefore, because there was no evidence that Stancill was substantially exposed to any condition outside his work which caused or contributed to cause the condition, the evidence established as a matter of law that the occupational disease arose out of Stancill's employment.

 "Factual findings of the Industrial Commission will be upheld on appeal if supported by credible evidence." *James v. Capitol Steel Constr. Co.*, 8 Va. App. 512, 515, 382 S.E.2d 487, 488 (1989); Code § 65.2-706. The causal relationship, or lack thereof, between a disease and employment is a question of fact. *Island Creek Coal Co.*, 6 Va. App. at 12, 365 S.E.2d at 788. Similarly, the "question [of causation] raised by 'conflicting expert medical opinions' is one of fact." *Eccon Constr. Co. v. Lucas*, 221 Va. 786, 790, 273 S.E.2d 797, 799 (1981). The deference that we give to the commission's fact finding on medical questions is based upon the "unwisdom of an attempt by . . . [courts] uninitiated into the mysteries to choose between conflicting expert medical opinions." *Johnson v. Capitol Hotel*, 189 Va. 585, 590, 54 S.E.2d 106, 109 (1949). Consequently, where the commission resolves the conflict in medical testimony, on appeal the medical issue will not be "settled by judicial fiat," and the commission's decision is binding so long as it is supported by credible evidence. *Id.* When, however, there is no conflict in the evidence or where there is no credible evidence to support the commission's factual findings, the question is the sufficiency of the evidence, which is a question of law. *VEPCO v. Kremposky*, 227 Va. 265, 269, 315 S.E.2d 231, 233 (1984); *City of Newport News v. Blankenship*, 10 Va. App. 704, 708, 396 S.E.2d 145, 147 (1990).[2]

---

[2] For cases which have reversed a finding by the commission of "no causation" or have reversed a holding that the evidence failed to prove causation, see *Ellis v. Commonwealth, Dep't of Highways*, 182 Va. 293, 303-04, 28 S.E.2d 730, 734-35 (1944) (Court reversed commission's finding that claimant's sarcoma was not causally related to employment); *Lermun v. Broward County Bd. of Comm'rs*, 555 So. 2d 419 (Fla. Dist. Ct. App. 1989) (Court reversed deputy commissioner where no explanation given for rejecting unrefuted medical testimony); *Olsen v. Wellcraft Marine Corp.*, 540 So. 2d 878 (Fla. Dist. Ct. App. 1989) (Deputy erred in rejecting unrefuted testimony of three psychiatrists that claimant's psychological problems were job-related); *Tussing v. George A. Hormel & Co.*, 461 N.W.2d 450 (Iowa 1990) (Court

■ Code § 65.2-101 of the Virginia Workers' Compensation Act defines "injury" as either "injury by accident" or "occupational disease." In 1986, the General Assembly revised the occupational disease statute to include certain repetitive and cumulative injuries other than conditions of the neck, back or spinal column.[3] Under Code § 65.2-400, a condition other than an ordinary disease of life, as defined in Code § 65.2-401, is an occupational disease if it arises out of and in the course of employment. The disease shall be deemed to arise out of the employment if it is apparent to the rational mind that a direct causal connection exists between the work conditions and the disease, that it followed as a natural incident from the nature of the work, that it can be fairly traced to the work as the proximate cause, and that it is incidental to the character of the business and had its origin in a risk connected with the employment. Code § 65.2-400. A claimant has the burden of proving that the condition flowed from the employment as a natural consequence. *Id.*

Despite Dr. Aulicino's uncontradicted medical opinion that Stancill's work activity, which entailed repetitive microtrauma to the left forearm and shoulder, caused the rotator cuff tear in his left shoulder,[4]

---

reversed commission that denied benefits to claimant for rotator cuff rupture because medical testimony was overwhelming that disability was job-related).

[3] Report of the Joint Subcommittee Studying Workers' Compensation, House Document No. 27, p. 8.

[4] Dr. Aulicino expressed the following medical opinion in a medical report dated April 15, 1990:

The patient gave me a work history regarding his left upper extremity when he was forced to place 3000 clips per day, since then he developed severe pain in his forearm and in his shoulder. [sic] He stated that he had to rely predominantly on his left upper extremity in order to maintain the production which was required. The patient states to me that he was pain free prior to this increase in work activity, and he did not relay to me any outside activity which could have caused this problem.

On examination on that date, I felt that the patient had a subacromial bursitis of his left shoulder, ruleout [sic] rotator cuff tear, and a radial tunnel syndrome over his left forearm. . . . The patient had an EMG performed through the radial tunnel and this was consistent with a radial tunnel syndrome. He also had a left shoulder arthrogram, which demonstrated the fact that he indeed had a rotator cuff tear. Therefore, my initial diagnoses were correct. The patient had a left rotator cuff tear and a left radial tunnel syndrome.

\* \* \*

*It is my opinion that there is a direct causal relation [between the claimant's work performed and the occupational disease].* The fact of the matter is, the patient was asymptomatic prior to doing the job, which required him to have pain and discomfort.

the commission found that "the evidence is not sufficient to establish [a] causal relationship between work activity and the condition described" and "that the medical evidence does not persuasively show that the employee's rotator cuff tear had its origin in a risk connected with employment."[5] The commission based its findings that Stancill failed to establish causation upon secondary factual findings that Stancill did not identify any specific physical movements that he performed as a part of his employment, "which are, in turn, described by Dr. Aulicino as being the origin and the cause of the rotator cuff tear or the radial tunnel syndrome," and that Stancill's testimony was inconsistent "with the history upon which Dr. Aulicino bases his conclusion as to causation." These subsidiary findings led the commission to discount and to disregard the uncontradicted medical testimony of Dr. Aulicino. We find, however, that these subsidiary findings of fact are either not supported by credible evidence or are based upon the commission's misperception of the evidence.

The commission erred in finding that Dr. Aulicino rendered a medical opinion that Stancill's work caused his rotator cuff tear without the doctor having knowledge of the physical activities and requirements which Stancill performed in doing his work. In Stancill's deposition testimony, which he introduced as his direct testimony at the hearing, Stancill, in fact, described the physical maneuvers required by his job. With regard to his spot welding tasks, Stancill testified that he used an overhead welding gun suspended from tracks and that, normally, his job entailed positioning the gun and pulling the trigger. He testified that when he had to "pick up" the welds missed by a malfunctioning robot, he "had to work that gun and stretch it way over to this other side and come all the way down." While the task did not involve heavy lifting, it required extra exertion and repetitive reaching. This extra exertion was required, he explained, because the welding gun

---

He subsequently developed severe pain in his shoulder, after an increase in load. It is my feeling, that it was the nature of this injury which caused the rupture of his rotator cuff, as well as the radial tunnel syndrome. It is well described in the literature that rotator cuff tears can be due to repetitive micro trauma, or they can be due to one specific traumatic blow. *It is obvious that the patient had significant trauma on a repetitive nature, that arose directly out of his employment.* Also, it is well described in the hand surgical literature that repetitive motion of the upper extremity may cause peripheral nerve compression neuropathies. (emphasis added).

[5] The commission also found that "there is no persuasive factual evidence which would indicate that Stancill's left shoulder and wrist problems have their origin in physical activity or work outside of employment."

which was suspended from overhead tracks was not "balanced to go all the way down the [assembly] line" in such a manner that it would reach a spot weld which the robots had missed. Thus, to make some welds, Stancill repeatedly had to reach and exert in order to perform his work. Additionally, Stancill described the activity required in affixing the steel clips to plates as follows:

You had a little sort of a C-shaped clip that goes on the end of your finger that helps hold the grill onto your truck. You have six slots there that you have to put clips in about that long. You have to clip four turned one way, flip your plate over and put two more clips another way, so it takes six clips each plate. So I would do my welding and make a plate, do my welding and make a plate. If the robot was broke down, I make five or six plates, so some days I would be caught up a little bit.

\* \* \* \* \*

You have a little nip on it like that, and I would have to use gloves like metal finishers had. Since I had to do it with the opposite hand, they had me some special gloves. You just put your finger on that clip and slide it in because you wouldn't have never been able to keep it up to hook each one of those. Somebody would run short in a few minutes as fast as you had to do it.

Moreover, Stancill recounted in his testimony that he had explained to Dr. Aulicino the logistics of this work activity and how he performed each function. But, of more importance, Dr. Aulicino had personally seen the physical functions that Stancill had performed when he was spot welding.

A Well, he just asked me what was I doing. I said, "I'm doing the work that you had came in and seen that I was doing." I said, "But they added clips on," and I explained to him, you know, that I had six clips per plate and I explained to him at times when the robot would break down, you know, you are liable to go a week without, like I explained, then I would have to do that. But other than those two things, he had been in and seen I was doing, that's what I was doing.

Q Did he ask you questions about what other activities you were involved in outside of work?

A He just asked me how many clips a day did I have to figure, six clips a piece, four hundred and fifty on a ten-hour day or something.

Q Did he ask you to demonstrate to him?

A Just like I explained to ya'll, he didn't know exactly what the plate was, and I just told him you had a place where you have to kind of snap the thing in a hole, it just don't slide in it easy, you have to force it in, and then you can't pull it out unless you beat it off. One end has the threads for your bolt to go in, so you had to have them a certain way so when they run the bolt through the other part of the fender, that holds it in place.

Q Did Dr. Aulicino say your shoulder problem was caused in anyway by the clips?

A He seemed to think it was. As far as I know, you know.

Q I'm just asking what he told you, if you recall.

A He said it had to do from the type of moving, pushing the clips on.

While Dr. Aulicino had not read Stancill's deposition at the time Dr. Aulicino was deposed, he had read Stancill's deposition testimony in which Stancill recounted the physical activity required by his job before Dr. Aulicino gave his opinion in his written report dated April 15, 1991. In the report, Dr. Aulicino expressly referred to Stancill's February 26, 1991, deposition testimony. Thus, when Dr. Aulicino opined in his written report of April 15, 1991, that Stancill's rotator cuff tear was directly causally related to the conditions under which he worked, he was not relying solely on the history provided to him by Stancill, which was the reason given by the commission for discrediting Dr. Aulicino's conclusion as to causation. Instead, Dr. Aulicino was relying on the medical history *and* Stancill's deposition in which Stancill described the nature of his work activity in regard to the nature of the physical task he performed in affixing the clips to the plate for an eight or ten hour shift, and Dr. Aulicino was personally aware of the nature of the tasks Stancill performed in spot welding. Moreover, in the same report, Dr. Aulicino specifically described the nature of Stancill's job activity. He wrote, ''he [Stancill] was forced to place 3000 clips per day, since then he developed severe pain in his forearm and in his shoulder. He stated that he had to rely predominantly on his left upper extremity in order to maintain the production which was required.'' Dr. Aulicino further wrote, ''[i]t is obvious that the patient had significant trauma on a repetitive nature, that arose directly out of his employment.'' Consequently, the commission's subsidiary factual findings that Stancill did not identify physical movements occasioned by his employment, which were described by

Dr. Aulicino "as being the origin and cause of the rotator cuff tear, and that Stancill's testimony was inconsistent with the medical history he provided Dr. Aulicino, and upon which Dr. Aulicino based his conclusion regarding causation," are not supported by credible evidence. Accordingly, we reverse the commission's decision. Because the only medical evidence in the record is the uncontradicted credible evidence of Dr. Aulicino that establishes that Stancill suffered from the occupational disease of a left rotator cuff tear, we remand the claim for entry of an award in accordance with this decision. Code § 8.01-681.

*Reversed and remanded.*

Koontz, C.J., and Baker, J., concurred.