COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Coleman and Lemons*
Argued at Richmond, Virginia


GEORGIA-PACIFIC CORPORATION

                                         OPINION BY
v.    Record No. 1644-99-2         JUDGE JAMES W. BENTON, JR.
                                         MARCH 21, 2000
MICHALENE L. ROBINSON


        FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            S. Vernon Priddy III (Patsy L. Mundy; Sands,
            Anderson, Marks & Miller, on brief), for
            appellant.

            Jeremy C. Sharp (Geoffrey R. McDonald &
            Associates, on brief), for appellee.


     Georgia-Pacific Corporation contends the Workers'

Compensation Commission erred when it ruled that Michalene L.

Robinson's psychiatric condition was causally related to her

injury by accident.  For the reasons that follow, we affirm the

commission's award.

                              I.

     Michalene L. Robinson sustained a work-related injury on

January 11, 1995, when her thumb was caught in a machine.  The

next day, Dr. Richard Holm, an orthopedist, performed surgery on

Robinson to repair a deep laceration and fracture of her right

---

        * Justice Lemons participated in the hearing and decision of
this case prior to his investiture as a Justice of the Supreme
Court of Virginia.

thumb. He released her to light duty to begin on January 16, 1995, instructing her not to use her right hand at work. When Robinson visited Dr. Holm on January 20, he returned her to work beginning January 23 and "with the restriction that she do no work with her right thumb." He also recommended physical therapy and informed her "that it may be a year before [she] obtain[s] a fixed and stable medical condition."

In March, Dr. Holm noted that Robinson "was extremely concerned as she was having increasing pain." Dr. Holm also noted that her pain resulted from "over use" and notified Georgia-Pacific that Robinson was to avoid unnecessary heavy gripping. Early in May, Robinson, Dr. Holm, and a Georgia-Pacific representative "had a very extended discussion . . . concerning [Robinson's] treatment course . . . [and] the goal of her recovery." Dr. Holm again asked Georgia-Pacific "to restrict heavy lifting, gripping and pulling activities with [her] right hand." He gave Robinson additional medication for her pain.

Robinson fainted at work on May 20, 1995, and was hospitalized. Robinson reported to the attending physician that she had "been in good health . . . until January . . . when she injured her thumb." Robinson said she had stress at work because of a conflict with a supervisor and her inability to use her hand; she also mentioned the death of a grandchild, which occurred May 19. The treating physician gave her medication for

-

anxiety, admitted her to the hospital, and diagnosed her as having syncopal episode, hypokalemia, and moderate stress anxiety.

Two days after her hospitalization, Dr. Holm recommended that Robinson consult with Dr. Bryan Spader, a psychiatrist. In that report, Dr. Holm noted that Robinson "is having a great deal of difficulty returning to her job" and noted that "[d]iscussions have been held with [Georgia-Pacific] to try to modify her work environment." Dr. Holm further stated that "Robinson continues to have problems with what appears to be a relatively minor injury causing a major change in her life-style." Several days later, Dr. Holm again evaluated Robinson and expressed the "concern . . . that [Robinson] is having a post-traumatic stress reaction." He found Robinson unfit for work pending her psychiatric examination.

The record reveals that Robinson was evaluated by three psychiatrists -- Dr. Bryan Spader, Dr. Merritt Foster, and Dr. James Corcoran. The commission considered various reports from these psychiatrists and found that Robinson's psychiatric treatment resulted from and was necessitated by her injury by accident. Georgia-Pacific contends that no credible evidence supports the commission's findings.

## II.

By statutory mandate, "an award of the Commission . . . shall be conclusive and binding as to all questions of fact."

-

Code § 65.2-706(A).  Thus, we have often expressed our standard of review as follows:

> In reviewing the commission's decision, we are guided by well-settled principles. "[I]t is fundamental that a finding of fact made by the [c]ommission is conclusive and binding upon this court on review."  "[T]hat contrary evidence may be in the record is of no consequence if there is credible evidence to support the [c]ommission's findings."

Sneed v. Morengo, 19 Va. App. 199, 204, 450 S.E.2d 167, 171 (1994) (citations omitted).  "The scope of a judicial review of the fact finding function of a workers' compensation commission [, therefore,] is 'severely limited, partly in deference to the agency's expertise in a specialized field.'"  Metropolitan Cleaning Corp. v. Crawley, 14 Va. App. 261, 266, 416 S.E.2d 35, 38 (1992).

Applying equally well-settled principles, the Supreme Court has held that the "question [of causation] raised by 'conflicting expert medical opinions' is one of fact."  Eccon Constr. Co. v. Lucas, 221 Va. 786, 790, 273 S.E.2d 797, 799 (1981).  Thus, the commission's "finding upon conflicting medical evidence that a certain condition does or does not exist is . . . a conclusive finding of fact."  McPeak v. P.W.& W. Coal Co., 210 Va. 185, 188, 169 S.E.2d 443, 445 (1969).  "The deference that we give to the commission's fact finding on medical questions is based upon the 'unwisdom of an attempt by . . . [courts] uninitiated into the mysteries [of the medical

-

science debate] to choose between conflicting expert medical opinions.'"  Stancill v. Ford Motor Co., 15 Va. App. 54, 58, 421 S.E.2d 872, 874 (1992) (citation omitted).

Given these principles of appellate review, we have held that "[t]he commission's findings are binding even if the weight of the evidence is contrary to those findings."  Kane Plumbing v. Small, 7 Va. App. 132, 136, 371 S.E.2d 828, 831 (1988).  We apply this standard because "[a] greater number of medical opinions does not necessarily constitute a preponderance of the evidence."  Island Creek Coal Co. v. Honaker, 9 Va. App. 336, 339, 388 S.E.2d 271, 273 (1990).  "The probative weight to be accorded [medical] evidence is for the Commission to decide; and if it is in conflict with other medical evidence, the Commission is free to adopt that view 'which is most consistent with reason and justice.'"  C.D.S. Const. Services v. Petrock, 218 Va. 1064, 1070, 243 S.E.2d 236, 240 (1978).  In its review of this case, the commission decided that the opinions of Dr. Spader and Dr. Corcoran were "entitled to greater weight" than those of Dr. Foster.  Honaker, 9 Va. App. at 339, 388 S.E.2d at 273.

Dr. Spader noted in his initial report on May 5, 1995, that Robinson expressed anxiety about difficulties performing routine tasks with her hand after her injury.  She also expressed lifestyle difficulties, such as loss of libido, loss of sleep, irritability, and thoughts of suicide following the accident.  Robinson believed that, within her limitations, she was "doing

-

her job well" after her injury, yet, "was being harassed by supervisors." Dr. Spader also reported other events in Robinson's life about which she was concerned.

In his evaluation report, Dr. Spader expressed a belief that Robinson was suffering from "Major Depression, single episode . . . [,] symptoms suggestive of [Post-traumatic stress disorder], and there may be some symptoms suggestive of dysthymia and an Axis II Disorder." In a letter to Dr. Holm, Dr. Spader stated that his "evaluation suggested presence of a Major Depression with sleep and appetite disturbance, irritability, crying more readily, loss of energy and some suicidal thoughts shortly after the accident began."

By letter of June 14, 1995, Dr. Holm informed Georgia-Pacific that Robinson's psychiatric condition placed Robinson and potentially her fellow workers at risk. He reiterated that he had "nothing to indicate this is not a reaction to her injury of January 1995."

At Georgia-Pacific's request, Dr. Foster examined Robinson on two occasions. In an extensive report on June 16, Dr. Foster opined that Robinson's emotional illness had its genesis "two to three years prior to her recent illness." He further opined "that her emotional illness culminated in her inability to accept criticism and adopt corrective measures, finally resulting in the injury to her right hand which precipitated the current evaluation." Thus, he concluded "that the injury to her

-

right hand . . . [did not cause] her current emotional symptomatology [but] was rather a product of her emotional illness."

On August 18, 1995, Dr. Holm reported that the fracture of Robinson's thumb had healed, that her joint was arthritic, that Robinson "clinically is having pain in her thumb," and that "she is complaining of pain over the crush wound site and also proximal to the radial styloid." He continued to restrict her from work until he could learn "whether . . . she is psychologically able to return to work." On October 13, 1995, Dr. Holm noted that Robinson continued to have "tenderness in her laceration site consistent with a radial sensory nerve injury." Although he recommended that she return to work, he again placed restrictions on heavy lifting, gripping, and pulling. Dr. Holm also noted that her psychiatric condition remained untreated.

Robinson began treatment with Dr. Corcoran in October 1995. In a letter of October 16, 1997, Dr. Foster reported that he had reviewed Dr. Corcoran's reports, which opined that Robinson suffers from Post-traumatic stress disorder and that her disability is a consequence of her January 11, 1995 injury. Dr. Foster stated that "Robinson's injury . . . does not fit the PTSD diagnosis . . . [and that] there is no evidence in the records of the usual litany of purely subjective symptoms, irrespective of the provable objective signs such as the

-

characteristic phobic avoidance."  He reiterated his opinion "that the injury to her right thumb occurring in an accident on . . . January 11, 1995, was a product of her emotional illness rather than a cause of whatever emotional symptomatology is currently present."

Over a period of a year and one-half, Dr. Corcoran treated Robinson and maintained his diagnosis of PTSD.  He opined "that Ms. Robinson's disability is related to her work-related injury of January 11, 1995, and that as a result of that injury she is disabled from all work."  He further noted that "while she may indeed have had some difficulties prior to her injury the present disability was clearly set in motion as a result of her work-related injury."

Dr. Foster again examined Robinson in April 1998 and reported that his opinion remained that Robinson's injury "was a product of her emotional illness rather than a cause of whatever symptomatology is currently present."  He also stated that Robinson "does not now and has never demonstrated enough of the characteristic symptomatology to warrant a diagnosis of Post-Traumatic Stress Disorder."

On May 11, 1998, Dr. Corcoran reported that his "opinion has not changed."  He stated that Robinson "more than adequately meets criteria for post traumatic stress disorder, a diagnosis made not only by myself, but also by previous psychiatrists who saw her shortly after her injury."  He concluded that "[o]verall

-

her behavior, her complaints and my clinical findings are quite consistent with a post traumatic stress disorder coupled with a paranoid personality."

III.

Evaluating this evidence, the commission made the following findings:

> After a careful review of Dr. Corcoran's treatment notes, it is clear that [Robinson] presented for psychiatric treatment that was related to her injury. Dr. Foster's account of Dr. Corcoran's February 20, 1996, office visit noted that Dr. Corcoran observed that [Robinson] was "very focused on . . . her injury." On January 29, 1997, Dr. Corcoran noted that [Robinson] was "told she could not use hand as previously." On April 7, 1997, Dr. Corcoran noted that [Robinson] "attributes all of her difficulty to her injury." On May 13, 1997, Dr. Corcoran noted that [Robinson] "remains focused on her accident and how this has affected her." By June 30, 1997, Dr. Corcoran's notes began reflecting [Robinson's] frustration she was experiencing in waiting for a decision about her entitlement to benefits. However, on February 27, 1998, Dr. Corcoran noted that the "process [was] set in motion by injury."
>
> Although Dr. Foster disagreed with Dr. Corcoran's analysis and opinion, instead stating that [Robinson's] condition was established long before the accident, we are persuaded that [Robinson's] treatment with Dr. Spader and Dr. Corcoran was necessitated by the January 11, 1995, accident. No evidence has been presented that [Robinson's] treatment was unnecessary, nor has any evidence been presented opining whether the treatment would have been the same had the accident not happened. [Robinson] admitted to her troubles with management, which cannot result in a compensable disability. Dr. Corcoran

-

> factored in this component of [Robinson's] condition, however, and opined that the injury triggered the extent of her condition. We agree . . . .

When the medical evidence conflicts, we do not re-weigh the preponderance of the evidence after the commission has done so. See Westmoreland Coal Co. v. Russell, 31 Va. App. 16, 20, 520 S.E.2d 839, 841 (1999); Wagner Enterprises v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991). Our review is limited to determining whether the record contains credible evidence to support the commission's findings. See id. The record contains more than ample credible evidence to support the findings. Accordingly, we affirm the award.

Affirmed.

-