COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Bumgardner and Kelsey
Argued at Alexandria, Virginia


DESPINA H. MILEOS

                                    MEMORANDUM OPINION* BY
v.    Record No. 3132-02-4          JUDGE D. ARTHUR KELSEY
                                         JULY 29, 2003
VENUS PIZZA AND
 ERIE INSURANCE EXCHANGE


        FROM THE VIRIGINIA WORKERS' COMPENSATION COMMISSION

        R. Craig Jennings (Brandt, Jennings, Snee,
        Dupray & Parrish, P.L.L.C., on brief), for
        appellant.

        Susan A. Evans (Siciliano, Ellis, Dyer &
        Boccarosse, on brief), for appellees.


    Despina H. Mileos appeals a decision from the Workers'

Compensation Commission, claiming it erred by terminating her

benefits on the grounds that (i) she could have resumed her

pre-injury employment duties in November 1999, and (ii) even if

she could not resume full duties, she in fact went back to work

and voluntarily quit without justification in June 2000.  We

affirm, finding persuasive the commission's second, alternative

ground for its holding.  We remand the matter to the commission,

however, to amend its order to recognize November 17, 2000, as

the effective date of termination.

_____

    * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

On appeal, we view the evidence in the light most favorable to the prevailing party before the commission. Clinchfield Coal Co. v. Reed, 40 Va. App. 69, 72, 577 S.E.2d 538, 539 (2003); Tomes v. James City (County Of) Fire, 39 Va. App. 424, 429, 573 S.E.2d 312, 315 (2002).

On April 22, 1999, Mileos suffered a compensable injury by accident when her left hand was caught in a dough machine at Venus Pizza. As a result of the accident, approximately two-thirds of Mileos's left middle finger was amputated. The employer accepted the injury as compensable, and the commission entered an award for temporary total disability.

Mileos and her husband have owned and operated Venus Pizza since 1983. She took an active role in the business prior to the accident. Mileos explained that, prior to her accident, she and her husband shared most of the principal duties: We "[b]oth do the job. If he cut[s] the cheese, I have to wash the dishes. If he make[s] the soup, I have to make the lasagna. Okay. We both we work for a living." Mileos's son has also helped in the restaurant since its opening in 1983. Prior to her accident, either Mileos's husband, her son, or a part-time employee would normally help Mileos (then 51 years old) lift or move heavy objects in the restaurant.

After the accident, Mileos testified, she still went to the restaurant everyday and stayed there pretty much all day. While there, she was able to "take orders, seat people, pass out menus, and give customers a glass of water." She also answered the telephone, waited on tables, and brought food out to customer's tables. Mileos claims, however, that she cannot perform her pre-injury duties that involve heavy lifting.

The deputy commissioner reviewed Mileos's extensive medical records. In an October 1999 report, Dr. Shepler, Mileos's treating physician at that time, opined that Mileos was fit to return to her pre-injury work duties without restriction. A month later, Dr. Shepler signed a pre-injury job description, reiterating that he saw "no limitation of her duties — there is no activity that will harm her or her hands." He added a caveat, however, that Mileos may need help if the "flour sacks" are heavy.

After receiving Dr. Shepler's October 1999 report, the employer filed an application to have Mileos's temporary total disability benefits terminated. The employer withdrew that application, without prejudice, after receiving the caveat about her need for help with heavy flour sacks.

With the employer's consent, Mileos sought additional care from Dr. Bruce Freedman. In January 2000, Dr. Freedman reviewed Mileos's job description and informed the employer that Mileos was able to return to work without restriction. The employer

-

filed another application to terminate benefits but, again, voluntarily withdrew it when Dr. Freedman amended his release a week later. In that amendment, Dr. Freedman put Mileos under a 25-pound lifting restriction after learning some of the flour and vegetable sacks may weigh as much as 40 to 50 pounds. Freedman reiterated his work release of Mileos, with the lifting restriction, in February 2000.

In June 2000, the employer retained Robert Hiler, a private investigator, to conduct surveillance on Mileos. On June 2, 2000, Hiler observed Mileos at Venus Pizza from 6:02 p.m. to 12:10 a.m. the next morning. During that time, Mileos seated customers, distributed menus, delivered food and drinks, waited on take-out customers, cleaned and set tables, and operated the cash register.

Hiler returned on June 7 and observed Mileos from 7:03 p.m. to 10:36 p.m. She greeted Hiler, seated him, and brought him a menu. Later, she brought Hiler's food and drink, furnished his bill, took his payment, and received a tip he left her. During these surveillance periods, Hiler testified, Mileos also helped in the kitchen area by putting food on plates, preparing a salad, and boxing and bagging takeout food. Hiler did not observe her lifting or attempting to lift any heavy objects.

On November 17, 2000, the employer filed its third application to terminate claimant's benefits. The application listed the following four alternative grounds for termination:

-

i.   "The employee returned to pre-injury work on 6/2/00 or before."

ii.  "The employee was released to return to pre-injury work on 11/23/99 per Dr. Shepler's report dated 11/23/99."

iii. "The employee returned to light-duty work on 6/2/00 or before at an average weekly wage of $ unknown."

iv.  "If the claimant is not earning wages and is capable of light duty, she has removed herself from the labor market effective June 2, 2000 or before."

Shortly after receiving the employer's application, Mileos returned to Dr. Freedman in January 2001.  Dr. Freedman noted that he had not seen Mileos since February 2000, ten months before.  He found that Mileos had "hyperextension changes with subluxation of the MCP joint of the left thumb."

Dr. Freedman again saw the claimant in July 2001 and wrote a letter to Mileos's counsel stating, "It appears that Ms. Mileos has finally destabilized her thumb.  I reported mild instability in a previous visit.  I believe that this problem has been exacerbated by the way that she uses her hand following her injury and long finger amputation."  Mileos, Dr. Freedman concluded, "has become functionally incapacitated . . . .  I do not believe that she can perform the required job activities at the restaurant."

At a hearing on October 31, 2001, the deputy commissioner found that Dr. Shepler released Mileos to her pre-injury job on November 23, 1999.  Mileos's condition had improved to the point

-

that she could perform her pre-injury duties despite any continuing physical impairments, the deputy commissioner held. The deputy commissioner also based her decision on the evidence describing the specific duties of employment prior to the accident and Mileos's work activities observed on the surveillance video after the accident. The deputy commissioner terminated Mileos's benefits effective November 23, 1999, the date of Dr. Shepler's fit-for-duty recommendation.

The full commission unanimously affirmed. Though Dr. Freedman later placed a specific weight restriction on claimant's work, the commission pointed out that Dr. Shepler was the treating physician in November 1999 —— the specific time period brought into question by the employer's application. The commission also observed that, as an owner of the restaurant, Mileos was in a position to direct others to perform any heavy lifting —— just as she had before the accident.

Like the deputy commissioner, the commission found the June 2000 surveillance videotapes to be persuasive corroborating evidence of claimant's work abilities. As the commission noted, the videos show that Mileos

> simply appears to be a right-hand dominant individual acting accordingly. While she is not observed cooking or carrying trays of food, the claimant is seen performing the tasks of a restaurant proprietor such as answering the telephone, bringing drinks, condiments and putting a pizza tray on the table, shuffling menus, working at the cash register, clearing and wiping tables. She

-

also folds napkins and puts down paper placemats. At one point she appears to be carrying a tray and taking a takeout order. . . . She is also seen in the June 7, 2000, tape bringing various items to a customer's table and taking the payment. She easily uses her left hand to scratch her right shoulder. We again observe nothing to indicate any favoring of the left hand other than what one might expect in a right-hand dominant individual.

"After careful consideration," the commission held, "we find that the evidence establishes that [Mileos] could return to her pre-injury work" on November 23, 1999. The commission also made an alternative holding that, even if Mileos could not perform all of the duties of her pre-injury work at that time, she had nevertheless returned to light-duty work and thereafter unjustifiably withdrew from the workplace in June 2000:

> Even if we were to find that the claimant was not released to regular work on November 23, 1999, we would find that subsequent to that date she was performing light duty work. The June 2000 tapes substantiate this. While the claimant may not have been paid a salary, it is clear from the evidence that she was performing work at the restaurant on a regular basis. If she were not paid, it was at her election as an owner not to do so. We also note that as of June 2000 there was no medical evidence that the claimant could not work. It was her testimony that after an attempt to work, she stopped. Her son testified that his father told her to stop. Based on this, we would also find the claimant by her own choice elected not to continue working at the restaurant after June 2000. For the reasons stated, the Opinion of the deputy commissioner is AFFIRMED.

-

In a footnote to its alternative holding, the commission stated that it made "no specific finding on the claimant's work ability after June 2000."

## II.

On appeal, Mileos devotes almost all of her argument to challenging the sufficiency of the evidence underlying the commission's finding that she recuperated enough from the accident to perform her pre-injury job duties. In doing so, Mileos all but overlooks the commission's alternative holding — one that we find dispositive of this appeal.

Under Code § 65.2-510(A), an employee "who refuses employment suitable to his capacity is not entitled to any compensation during the period of refusal unless the refusal is justified." Newport News Shipbuilding & Dry Dock Co. v. Lawrence, 38 Va. App. 656, 661, 568 S.E.2d 374, 376 (2002). The issue ordinarily arises when an employer offers a light-duty job to the employee, who then refuses it as unsuitable. In a similar vein, an employee must make a reasonable effort to market her residual work capacity when the facts and circumstances reveal to an objectively reasonable person that she can return to some level of employment. See Ridenhour v. City of Newport News, 12 Va. App. 415, 416, 404 S.E.2d 89, 89 (1991). These same principles equally govern the situation of an employee who actually returns to work with the same employer,

-

allegedly in a light-duty capacity, and then quits claiming the job was not suitable.

Applying the selective-employment and residual capacity principles to this case, we hold that, when an employee returns to work with the employer and then quits, the employer bears the burden of proving that the job was "suitable to the employee's capacity." Atlas Plumbing & Mech., Inc. v. Lang, 38 Va. App. 509, 512, 566 S.E.2d 871, 872-73 (2002) (citation omitted). If the employer proves suitability, the burden of proof shifts to the employee to demonstrate that his decision to quit was "justified." Id. at 513, 566 S.E.2d at 873 (citing Talley v. Goodwin Bros. Lumber Co., 224 Va. 48, 53, 294 S.E.2d 818, 821 (1982)). "To support a finding of justification to refuse suitable selective employment, 'the reasons advanced must be such that a reasonable person desirous of employment would have refused the offered work.'" Clements v. Riverside Walter Reed Hosp., 40 Va. App. 214, 224, 578 S.E.2d 814, 818 (2003) (citation omitted). Justification, or the lack of it, presents a "question of fact" for the commission. Gallahan v. Free Lance Star Pub. Co., 37 Va. App. 114, 118, 554 S.E.2d 685, 686 (2001).[1]

---

[1] In its role as factfinder, the commission "resolves all conflicts in the evidence and determines the weight to be accorded the various evidentiary submissions." Bass v. City of Richmond Police Dept., 258 Va. 103, 114, 515 S.E.2d 557, 563 (1999). When based on credible evidence, the commission's judgments are "conclusive and binding as to all questions of fact." Id. (quoting Code § 65.2-706(A)). Thus, unless our

-

Credible evidence supports the commission's finding that Mileos returned to work at Venus Pizza in a suitable job and then, without justification, quit. The surveillance tapes show Mileos on the job in June 2000 performing the employment tasks of a restaurant proprietor. Proof of her physical ability to perform these tasks rests not only on the lack of any observable difficulty in doing so, but also on the medical reports of Dr. Shepler (issued in October and November 1999) and Dr. Freedman (issued in January and February 2000). Both had given unambiguous opinions releasing Mileos to return to work at Venus Pizza, subject only to a caveat prohibiting heavy lifting. See Ridenhour, 12 Va. App. at 416, 404 S.E.2d at 89 (recognizing that an employee who objectively may return to light-duty employment but effectively removes himself from the labor market is not entitled to total disability payments).

Mileos's self-serving decision to attribute all of the income from Venus Pizza to her husband (and away from herself) did not render her post-accident employment there a gratuity. If anything, such evidence suggests that she participated in a

_____

review requires a de novo interpretation of law, we limit our task on appeal to discerning whether credible evidence exists to support the commission's decision. "If there is evidence, or reasonable inferences can be drawn from the evidence, to support the commission's findings, they will not be disturbed on review, even though there is evidence in the record to support a contrary finding." S.P. Terry Co. v. Rubinos, 38 Va. App. 624, 632, 567 S.E.2d 584, 588 (2002) (citations omitted)).

-

subterfuge to hide the fact of her reemployment and to provide plausible deniability by reporting no salary income from her work.

We also reject Mileos's argument that the commission erred by relying on Dr. Shepler's medical opinions given the commission's longstanding policy of rejecting "stale" evidence. See, e.g., Meekins v. Legend Group, 1998 Va. Wrk. Comp. LEXIS 4447 (1998); Quaglio v. Lechter's, Inc., 1995 Va. Wrk. Comp LEXIS 365 (1995). We do not view the stale-evidence principle as a discrete rule of law, different in substance from the rather obvious proposition that evidence closer in time to the relevant event may be considered more persuasive than evidence more remote in time. The persuasiveness of evidence does not turn solely on timing issues. Any number of variables, timing being but one, may influence a factfinder's decision to attribute differing degrees of weight to different facts.

Suffice it to say, we defer to the commission's assessment of the "probative weight to be accorded evidence" and, if it is in conflict, the commission "is free to adopt that view 'which is most consistent with reason and justice.'" Georgia-Pac. Corp. v. Robinson, 32 Va. App. 1, 5, 526 S.E.2d 267, 269 (2000) (quoting C.D.S. Const. Servs. v. Petrock, 218 Va. 1064, 1071, 243 S.E.2d 236, 241 (1978)) (bracketed material omitted). The commission did just that in assessing the evidence Mileos claims was stale:

-

> We find nothing to indicate that these
> medical reports are stale. The allegation
> was that the claimant was released to return
> to regular work on November 23, 1999.
> Dr. [Shepler] released the claimant to
> return to work on October 23, 1999. He also
> signed a job description on November 23,
> 1999. There is no medical evidence as of
> that time that the claimant could not work.
> While subsequent evidence may have been
> developed this does not mean that the
> earlier evidence is "stale."

No evidence in this case demonstrated any change in Mileos's work capacity during the period between Dr. Shepler's 1999 opinion and the employer's November 2000 application. The principal evidence of her condition during this period — the June 2000 surveillance videos — corroborate Dr. Shepler's earlier opinion.

That said, we disagree with the commission's use of November 23, 1999, as the effective date of termination of benefits. With limited exceptions, Commission Rule 1.4(C) requires an employer to continue paying benefits until the date the employer files an application for termination. This rule parallels Code § 65.2-708, which prohibits the commission from issuing a ruling having a retroactive effect on benefits paid prior to the filing of the application. See generally Bristol Door Co. v. Hinkle, 157 Va. 474, 477, 161 S.E. 902, 903 (1932) (neither an employer nor a claimant may be awarded retroactive awards on a change of condition application); Collins v. Dept. of Alcoholic Bev. Con., 21 Va. App. 671, 676-77, 467 S.E.2d 279,

-

281 (1996) (endorsing employer's concession that an application based on change of conditions could apply only "prospectively").

In this case, the employer filed three applications seeking termination of benefits based upon changed circumstances. Each time, the employer suspended payments. The first two applications, filed in November 1999 and January 2000, were voluntarily withdrawn by the employer and dismissed by the commission. Each time, the employer reinstated payments to Mileos. These payments continued through November 17, 2000, the date of the employer's third application and the one at issue in this appeal.

By terminating benefits effective November 23, 1999 — a year before the November 17, 2000 application filing date — the commission created a retroactive credit to the employer in violation of Rule 1.4(C) and Code § 65.2-708.[2] We are unaware of any authority (and are unwilling to create any) for the principle that a termination effective date can relate back to an earlier application withdrawn by the employer and dismissed by the

_____

[2] Rule 1.4(C)(4) provides that an employer who files successive applications need only pay compensation up to the date of filing the first application. This principle, however, does not apply in our case because (i) the employer voluntarily reinstated payments after withdrawing the first two applications, and (ii) the first two applications were formally dismissed by orders of the commission. See, e.g., Day v. Shenandoah Fiberglass Prods. Co., 70 O.I.C. 73, 74-75, 70 Va. WC 73, 74-75 (1991) ("If the first application had been dismissed, the employer would have had to pay benefits to the date the second application was filed.").

commission.  For this reason, we remand this case to the commission to amend its order to reflect the effective date of termination as November 17, 2000, the filing date of the application under review.

### III.

Finding that credible evidence supports the commission's decision to terminate benefits, we affirm.  We remand the matter to the commission to amend its final order to establish November 17, 2000, as the termination date.

<u>Affirmed and remanded.</u>

-