JAMES W. BENTON, JR., Judge.
The Workers’ Compensation Commission awarded benefits and expenses under the Virginia Birth-Related Neurological Compensation Act, Code §§ 38.2-5009 through 38.2-5021, to Michele Bakke and Jonathan Bakke, parents and next friends of Jenna Marie Bakke. The Commonwealth of Virginia, Virginia Birth-Related Neurological Injury Compensation Program, and the Virginia Birth-Related Neurological Injury Compensation Program Board (collectively designated “the Program”) contend the commission erred (1) in applying the Act’s rebuttable presumption that the infant’s injury is a birth-related neurological injury, (2) in finding that some of the physicians were the most qualified to evaluate the timing of the infant’s injury, (3) in concluding that evidence was insufficient to rebut the presumption, and (4) in finding that the *513 Program failed to prove a specific non-birth-related cause of the injury. We affirm the commission’s award.
I.
During her pregnancy, Michele Bakke received a diagnosis of HELLP syndrome (hemolysis, elevated liver enzyme levels and low platelet count) and preeclampsia. Because of the life-threatening dangers to Bakke and her child associated with these conditions and because of Bakke’s low platelet count, physicians delivered her child by cesarian section without labor. At her birth on September 2, 1999, the infant’s gestational age was estimated to be twenty-nine weeks. She weighed .885 kilograms and was 33 centimeters long. The medical records indicate the infant had “NO RESPIRATION” at delivery and was intubated immediately. A handwritten note included -within the delivery records shows that she “did make some resp effort.” At that time, the infant’s Apgar score was five. Five minutes after birth, her Apgar score was seven. When the infant was admitted to the neonatal intensive care unit, a note indicated her condition as “responsive in severe respiratory distress.” The infant’s chest x-ray report indicated “WHITE OUT LUNGS,” and the infant was put on a ventilator, where she remained for a month. The discharge summary noted diagnoses for twelve diseases or conditions.
The medical records from the period of the infant’s birth to her discharge from the hospital on December 7, 1999 are extensive. Likewise, the commission’s record contains extensive testimony, reports, and other documents from physicians regarding the infant’s condition at birth and later. In two succinct sentences, the commission addressed the nub of the issue in this case:
The medical professionals who have evaluated [the infant’s] medical history disagree regarding when and how [she] actually sustained the injury causing her cerebral palsy. While Dr. [James T.] Christmas and the members of the [medical panel] who reviewed [the infant’s] case have opined that [she] did not sustain an injury during the course *514 of her labor, delivery, resuscitation or immediately after her birth, Dr. [J. Peter] VanDorsten, Dr. [Daniel] Lefton, Dr. [M. Elizabeth] Latimer and Dr. [Marcus C.] Hermansen have all opined that [she] was injured around the time of her birth.
In a lengthy opinion, the commission reviewed in detail the medical evidence and found that the more persuasive opinions were rendered by those physicians who opined that the damage to the infant’s brain was caused at birth. The Program contends that the commission’s reasoning is flawed and that the award should be reversed.
II.
The Virginia Birth-Related Neurological Injury Compensation Act provides compensation to families whose infants suffer “birth-related neurological injuries” caused by a participating physician or a participating hospital. Code §§ 38.2-5000 to 38.2-5021. A “birth-related neurological injury” is defined as follows:
[I]njury to the brain or spinal cord of an infant caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation in the immediate post-delivery period in a hospital which renders the infant permanently motorically disabled and (i) developmentally disabled or (ii) for infants sufficiently developed to be cognitively evaluated, cognitively disabled.
Code § 38.2-5001. Thus, to satisfy this statutory definition the following four factors necessarily must be established:
(1) The infant sustained “an injury to the brain or spinal cord” that was “caused by deprivation of oxygen or mechanical injury.”
(2) The injury occurred “in the course of labor, delivery or resuscitation necessitated by a deprivation of oxygen or mechanical injury that occurred in the course of labor or delivery, in a hospital.”
(3) The injury rendered the infant “permanently motorically disabled and (i) developmentally disabled or (ii) for infants *515 sufficiently developed to be cognitively evaluated, cognitively disabled.”
(4) Such disability caused “the infant to be permanently in need of assistance in all activities of daily living.”
Central Virginia Obstetrics & Gynecology Assoc., P.C. v. Whitfield, 42 Va.App. 264, 273, 590 S.E.2d 631, 635-36 (2004) (quoting Code § 38.2-5001) (footnote omitted).
III.
Initially, we address the Program’s contention that the commission “err[ed] in applying the presumption set forth in ... Code § 38.2-5008.” We conclude that this claim lacks merit.
“The legislature, recognizing the difficulty in proving when, but not whether, such an injury was sustained, enacted a presumption to assist potential claimants in obtaining benefits.” Wolfe v. Virginia Birth-Related Neuro. Injury Comp. Pgm., 40 Va.App. 565, 578, 580 S.E.2d 467, 473 (2003). This presumption is described by the statute as follows:
A rebuttable presumption shall arise that the injury alleged is a birth-related neurological injury where it has been demonstrated, to the satisfaction of the Virginia Workers’ Compensation Commission, that the infant has sustained a brain or spinal cord injury caused by oxygen deprivation or mechanical injury, and that the infant was thereby rendered permanently motorieally disabled and (i) developmentally disabled or (ii) for infants sufficiently developed to be cognitively evaluated, cognitively disabled.
Code § 38.2-5008(A)(1). “Once the presumption applies, the burden of proof shifts to the party opposing the presumption to disprove elements two and four[, as listed in Part II above], and thereby establish ‘that the injuries alleged are not birth-related neurological injuries within the meaning of the chapter.’ ” Whitfield, 42 Va.App. at 273, 590 S.E.2d at 636 (quoting Wolfe, 40 Va.App. at 578, 580 S.E.2d at 474 and Code § 38.2-5008(A)(1)).
*516 On its review, the commission ruled that the deputy commissioner “concluded that the medical evidence predominated in establishing that the presumption provided in Code § 38.2-5008 applies to [the infant’s] case and the program has not requested review of that finding.” Credible evidence in the record supports this ruling.
The deputy commissioner found,
after considering the three volumes of medical records plus all of the expert medical opinions ..., that the infant is entitled to the rebuttable presumption that her injury as alleged is a birth-related neurological injury caused by oxygen deprivation ...[,] that the infant is both developmentally and cognitively disabled ... [, and that the] physicians and hospital also participated in the Program.
The deputy commissioner expressly relied upon the opinions of Drs. VanDorsten, Latimer, Lefton, and Hermansen to support these findings.
On the commission’s review, the Program asserted in its written statement that the deputy commissioner’s “ruling is consistent with and founded upon a correct application of the law and ... credible evidence.” The Program’s written statement concluded “that the rulings of [the deputy commissioner] ... should be sustained and affirmed in full.” This unambiguous, express language in the Program’s written statement supports the commission’s finding that the issue of the infant’s entitlement to the rebuttable presumption was not raised by the Program at the commission’s review.
Rule 5A:18 bars our review of issues that were not put “before the commission on review in [the party’s] written statement or its reply to the [other party’s] written statement ... [and that were] not considered by the full commission.” Berner v. Mills, 38 Va.App. 11, 18, 560 S.E.2d 925, 928 (2002). See also Williams v. Gloucester Sheriffs Dep’t, 266 Va. 409, 411, 587 S.E.2d 546, 548 (2003) (noting that parties may raise issues before the commission by motions to reconsider); Overhead Door Co. of Norfolk v. Lewis, 29 Va.App. 52, 62, 509 S.E.2d 535, 539-40 (1999) (same); Steadman v. Liberty Fab *517 rics, Inc., 41 Va.App. 796, 806 n. 3, 589 S.E.2d 465, 467 n. 3 (2003) (noting failure of the party to appeal an issue decided adversely by the deputy commissioner and declining to consider that issue on appeal because it was not addressed by the commission on review). We hold that credible evidence in the record supports the commission’s finding that the Program did not present for review the deputy commissioner’s ruling that the evidence was sufficient to entitle the infant to the Code § 38.2-5008 presumption. Accordingly, this issue is not properly preserved for appeal.
IV.
The Program also contends the commission erred in concluding the evidence was “insufficient to defeat the presumption set forth in ... Code § 38.2-5008(A)(1).” The Program argues that (1) the physicians the commission relied upon were not the most qualified to evaluate the timing of the injury, (2) the opinions expressed by the medical panel and Dr. Christmas were sufficient to prove the injury did not occur during delivery or resuscitation in the immediate post-delivery period, and (3) the evidence was sufficient to prove a specific non-birth-related cause of the infant’s injury. We disagree.
The Act provides that “[t]he determination of the Commission pursuant to [Code] § 38.2-5008[(A)(1) through (A)(3)] ..., or a determination or award of the Commission upon ... review [of the evidence], as provided in [Code] § 38.2-5010, shall be conclusive and binding as to all questions of fact.” Code § 38.2-5011. On appeal from the commission’s review of the evidence and from its decision under the Act, we apply our usual standard of review and consider the evidence “in the light most favorable to the prevailing party before the commission.” Whitfield, 42 Va.App. at 269, 590 S.E.2d at 634.
A.
The Program contends the commission’s decision is flawed because the commission “erred in concluding that certain medical experts are the most qualified to evaluate the *518 timing of the injury ... based solely on their stated occupations or specialities.” Essentially, the Program contends we should overturn the commission’s finding that the injury occurred at the time of the birth because the Program’s expert was more qualified to make that determination.
Resolving the conflicting testimony of the physicians, the commission made the following findings:
Of the physicians who have offered expert opinions in this case, we conclude that Drs. Hermansen and Latimer are the most qualified to evaluate the timing of the injury causing [the infant’s] cerebral palsy. Dr. Hermansen is a pediatrician who specializes in neonatology and Dr. Latimer is a neurologist specializing in treating children. In contrast, Drs. Christmas, VanDorsten and the members of the [medical panel] are obstetricians, gynecologists and specialists in maternal-fetal medicine who, although involved in high-risk pregnancies involving mothers and fetuses, do not regularly treat infants after their birth.
On appeal, we are guided by the statutory mandate of Code § 38.2-5011 and well-settled principles. The Supreme Court has held that “[t]he Commission’s factual findings are ‘conclusive and binding’ and a question raised by ‘conflicting expert medical opinions’ is ‘one of fact.’ ” Eccon Const. Co. v. Lucas, 221 Va. 786, 790, 273 S.E.2d 797, 799 (1981) (citations omitted). In other words, the commission is to decide the “probative weight” to be given to conflicting medical evidence. C.D.S. Const. Services v. Petrock, 218 Va. 1064, 1071, 243 S.E.2d 236, 241 (1978).
We have applied these same principles in appeals concerning the commission’s consideration of conflicting medical opinions when resolving issues arising under the Act.
“Questions raised by conflicting medical opinions must be decided by the commission.” This appellate deference is not a mere legal custom, subject to a flexible application, but a statutory command making clear that the commission’s decision “shall be conclusive and binding as to all questions of fact.” Medical evidence, therefore, remains *519 “subject to the commission’s consideration and weighing.” And the appearance of “contrary evidence in the record is of no consequence if there is credible evidence to support the commission’s finding.”
Whitfield, 42 Va.App. at 279, 590 S.E.2d at 639 (citations omitted). See also Kidder v. Va. Birth-Related Neuro. Injury Comp. Pgm., 37 Va.App. 764, 778, 560 S.E.2d 907, 913 (2002); Va. Birth-Related Neuro. Injury Comp. Pgm. v. Young, 34 Va.App. 306, 318, 541 S.E.2d 298, 304 (2001).
The commission reviewed the evidence, the qualifications of the physicians, and the areas of conflict among the physicians. The commission did not conclude that the Program’s experts were incredible but, rather, found the opinions of the other physicians to be more persuasive. We cannot say that the commission erred by giving more weight to the opinions of those physicians who specialize in neonatology and pediatric neurology. As we and the Supreme Court have often explained, “[t]he deference that we give to the commission’s fact finding on medical questions is based upon the ‘unwisdom of an attempt by ... [courts] uninitiated into the mysteries [of the medical science debate] to choose between conflicting expert medical opinions.’ ” Stancill v. Ford Motor Co., 15 Va.App. 54, 58, 421 S.E.2d 872, 874 (1992) (quoting Johnson v. Capitol Hotel, Inc., 189 Va. 585, 590, 54 S.E.2d 106, 109 (1949)). See also Amelia Sand Co. v. Ellyson, 43 Va.App. 406, 409, 598 S.E.2d 750, 751 (2004). We, therefore, decline the Program’s invitation to consider the institutions from which the physicians graduated and received their training as a basis for concluding the commission should have given the testimony of other, physicians greater weight. We hold that the commission thoroughly examined the evidence and made a factual determination that is supported by credible evidence.
B.
The Program contends the commission “erred in concluding that the opinions ... by the [medical panel] and Dr. *520 Christmas regarding the timing of the injury ... were insufficient to defeat the presumption.” We disagree.
“[T]o defeat the Code § 38.2-5008(A)(1) presumption, the Program must prove, to a reasonable degree of medical certainty both (1) that the [infant’s] ... injury did not occur ‘in the course of labor, delivery or resuscitation in the immediate post-delivery period in a hospital’ and (2) that there was a specific, non-birth-related cause of the injury.” Coffey v. Va. Birth-Related Neur. Injury Comp. Pgm., 37 Va.App. 390, 402, 558 S.E.2d 563, 569 (2002).
“The determination whether the employer has [rebutted the presumption and carried its burden of proof] is made by the Commission after exercising its role as finder of fact. In this role, the Commission resolves all conflicts in the evidence and determines the weight to be accorded the various evidentiary submissions. ‘The award of the Commission ... shall be conclusive and binding as to all questions of fact.’ ”
Young, 34 Va.App. at 317, 541 S.E.2d at 304 (citation omitted).
The commission made extensive findings supporting its conclusion that the Program failed to rebut the presumption contained in Code § 38.2-5008(A)(1). We relate in detail a portion of those findings:
Of the physicians who have offered expert opinions in this case, we conclude that Drs. Hermansen and Latimer are the most qualified to evaluate the timing of the injury causing [the infant’s] cerebral palsy----
Both Dr. Hermansen and Dr. Latimer have opined that the damage to [the infant’s] brain was caused near the time of her birth, and we find their opinions to be persuasive. We also disagree with the [deputy commissioner’s] conclusion that there is no objective evidence supporting the opinions of Drs. Hermansen and Latimer.
[The infant’s] medical records immediately after her birth show that she displayed no respirations prompting those who were treating her to intubate immediately. A chest x~ ray was taken showing “whiteout lungs” and [the infant] *521 was diagnosed with respiratory distress syndrome and hylan membrane disease, causing her to be placed on mechanical ventilation for a significant period of time while she was in NICU. It is also undisputed that hylan membrane disease interferes with the delivery of oxygen to the body.
Although [the infant’s] initial blood gas levels were read as normal, these levels were taken after [she] had been given oxygen. The medical records also reflect that [the infant] was treated for metabolic acidosis within the first day of her life, despite her base excess level of -9.5 falling within the “normal” range for a full term infant, thereby supporting Dr. Hermansen’s conclusion that [the infant] had at least some level of metabolic acidosis.
In addition, [the infant’s] medical records show that she suffered from hypotension at birth and for several days thereafter. Dr. Latimer explained that such hypotension is “commonly known” to cause PVL and PVL is known to cause cerebral palsy. Dr. Christmas agreed while testifying that hypotension can injure the brain and cause PVL in preterm infants.
Furthermore, as noted by Dr. Hermansen, [the infant’s] head ultrasound performed on September 4, 1999, and reviewed by Dr. Lefton, a neuroradiologist, showed evidence of a cerebral edema soon after [the infant’s] birth, thereby supporting the conclusion that [the infant] had sustained a recent brain injury. The lack of PVL on [the infant’s] first ultrasound constitutes additional evidence that her brain injury did not occur long before her birth.
Upon our Review of the medical records in their entirety and our Review of the various opinions expressed by experts in this case, we conclude that the evidence with respect to the timing of the oxygen deprivation causing the injury to [the infant’s] brain is, at most, equipoise. Therefore, while we do not ignore the opinions expressed by the [medical panel] and Dr. Christmas, we conclude that their opinions are insufficient, in light of the contrary opinions expressed by Drs. Hermansen and Latimer, as buttressed *522 by Drs. Lefton and VanDorsten, to defeat the presumption of Code § 38.2-5008(A)(1).
The Program challenges these findings and contends there was “no evidence of metabolic acidosis or [edema] in the medical records and no specific reference to an hypoxic event during the statutory period.” We disagree. Simply put, the Program asks us to reweigh the evidence, contrary to our standard of review, and find in its favor. As we have consistently held in reviewing decisions under the Act, “the appearance of ‘contrary evidence in the record is of no consequence if there is credible evidence to support the commission’s finding.’ ” Whitfield, 42 Va.App. at 279, 590 S.E.2d at 639 (quoting Young, 34 Va.App. at 318, 541 S.E.2d at 304, and Kidder, 37 Va.App. at 778, 560 S.E.2d at 913). A review of the record demonstrates substantial credible evidence supporting the commission’s findings.
Significantly, the commission gave thorough and reasoned consideration to the contrary opinions of the Program’s medical expert, Dr. Christmas, when it made its decision. To take one example, Dr. Christmas recognized the possibility of edema, testifying that “there is allegedly edema noted on the first scan and two weeks later there’s not any edema so ... it must have been very mild edema noted on the first exam if, in fact, there was any edema.” Reviewing his testimony, the commission found that Dr. Christmas merely “speculated that the cerebral edema shown on the first ultrasound must have been fairly small” and noted that “Dr. Christmas did not actually review the ultrasounds.” The commission further noted that Dr. Christmas “also deferred to a radiologist regarding what [the ultrasounds] actually showed.”
The commission gave greater weight to the opinion of Dr. Daniel Lefton, a board certified radiologist who also has a qualification in neuroradiology. Unlike Dr. Christmas, Dr. Lefton actually examined the ultrasounds. He reported “[t]o a reasonable degree of medical certainty [the infant’s] brain injury (PVL) resulted from a hypoxic-ischemic encephalopathy *523 during the immediate delivery and resuscitation period.” In support of his conclusion, he noted the following:
Both of the MRI studies show clear evidence of periventricular leukomalacia (FVL): an hypoxic ischemic injury to the white matter of the brain surrounding the ventricles. This neuroradiologic finding is typically found in premature infants requiring resuscitation and mechanical ventilation at the time of delivery----
The September 4, 1999, head ultrasound performed on day two of life is strongly consistent with the opinions expressed above, and further confirms that [the infant’s] injury occurred at or about the time of delivery. The films from this study show increased echogenicity, or “cerebral edema.” The finding of cerebral edema on ultrasound is an early radiologic manifestation of an hypoxic ischemic injury that is later manifested as FVL. PVL is not usually seen radiographically until about two weeks after the hypoxic/isehemic event.
In conclusion, these three studies demonstrate that [the infant] suffered a brain injury to the periventricular white matter from lack of oxygen or blood supply at or around the time of birth.
In contrast to Dr. Christmas’s conclusion that the edema must have been mild, Dr. M. Elizabeth Latimer, a board certified child neurologist who examined the infant and reviewed the medical records, reported the following:
[The infant] did have an ultrasound done on day 2 of life which showed no hemorrhage but did show cerebral edema. This was not reported at the time of exam, most likely because the primary focus of the initial exam was to rule out intraventricular hemorrhage. On the subsequent exams in the NICU, [the infant] had resolution of the cerebral edema which clearly times the cerebral insult to the immediate perinatal period. Additionally, there is no evidence of periventricular leukomalacia on the initial exam. The absence of the appearance of periventricular leukomalacia makes it *524 highly unlikely that the injury occurred significantly prior to delivery----
With regard to imaging studies, she had an MRI done ... at age one which although read as normal, clearly was not. This MRI definitely demonstrates Periventricular Leukomalacia. This finding is highly significant because it is seen primarily in premature infants who also have either hypoxemia or hypotension during the immediate perinatal period. This area of the brain in premature infants is extremely vulnerable to low flow states, such as low blood pressures, which [the infant] sustained during the immediate resuscitation period following delivery. The reason for this is because premature babies delivered prior to 32 weeks gestation lack autoregulation.... In the premature infant, there is no autoregulation so when the blood pressure drops, the blood flow to the brain drops accordingly. The vulnerable portion of the brain, the periventricular region is the most vulnerable and in this case the most damaged.
# ^ * sH tfc
In summary, [the infant] has a Permanent Neurologic Injury caused by a lack of oxygen to the brain, which is severe and is temporally related to the immediate period following her premature birth. She had profound hypotension at birth which was documented and treated in the records. It is commonly known that such hypotension at this stage of prematurity causes Periventricular Leukomalacia. She is permanently disabled with no hope of meaningful recovery. She is likely to never walk independently. She is most likely, at best, to have an IQ of 25-50, and will never be employable. She will require assistance with all activities of daily living for her entire life and is expected to have a normal life span.
Dr. Marcus Hermansen, a board certified pediatrician and neonatologist also reviewed the medical records and Dr. Lefton’s report. He opined as follows:
PVL is a form of ischemic (inadequate blood flow) brain injury seen most commonly in premature infants. [The *525 infant’s] PVL occurred around the time of her birth. This timing is based upon her critical condition at birth and in the immediate post-birth period and the cerebral edema on the head ultrasound study at two days of age. Immediately after her birth she had no respiratory effort followed by severe respiratory distress. She also had a metabolic acidemia and severe hypotension. All of these clinical observations demonstrate evidence of brain ischemia.
Cerebral edema is seen on neuro-imaging studies for a few days following significant brain injury. The typical changes of PVL are seen weeks or months later. The presence of cerebral edema on September 4, 1999 is strong evidence of recent brain injury. In addition, the lack of PVL on the initial ultrasound is strong evidence that the brain injury did not occur long before the birth.
The record likewise contains evidence to support the commission’s finding, which is contested by the Program, that at birth the infant “displayed no respiration prompting those who were treating her to intubate immediately.” Dr. James VanDorsten, who is board certified in maternal fetal medicine and is chairman of the department of obstetrics and gynecology at a medical university, testified that the infant had hypotension in the immediate post-delivery period, that the infant “was not breathing at all” at birth, and that this “required an intervention, an intubation.” He opined that “[i]ntubation at less than a minute by experienced neonatologists ... would be unusual.” That is, the physicians would not have intubated so quickly had the infant not been in serious respiratory distress. He also testified that the infant “had acidosis in the first day of life that required treatment with bicarbonate,” which was another indication that the infant did not receive adequate oxygen, resulting in her injury.
This is the evidence the commission found to be persuasive. These reports refute the Program’s suggestion that the commission’s findings lacked credible evidentiary support. As the Supreme Court has consistently held, a “finding of the Commission upon conflicting medical testimony that a condition ... was due to [one cause] rather than to [another cause] is *526 ... a finding of fact” and is conclusive and binding on appeal. Johnson, 189 Va. at 588, 54 S.E.2d at 107-08 (citing Estep v. Blackwood Fuel Co., 185 Va. 695, 699, 40 S.E.2d 181, 183 (1946), and Mulkey v. Firth Bros. Iron Works, 188 Va. 451, 455, 50 S.E.2d 404, 406 (1948)).
The Program argues that the commission “erred as a matter of law in finding the evidence to be in equipoise” when its expert and the medical panel gave opinions “to a reasonable degree of medical certainty.” This argument about “reasonable medical certainty” was not posed as a question presented for review but, rather, is raised merely in the context of suggesting that the commission gave the opinions of various physicians undue weight. Significantly, the Program does not contend that the medical evidence the commission considered was not credible. As we explained in Georgia-Pacific Corp. v. Robinson, 32 Va.App. 1, 526 S.E.2d 267 (2000), the commission determines which medical evidence is credible.
Applying equally well-settled principles, the Supreme Court has held that the “question [of causation] raised by ‘conflicting expert medical opinions’ is one of fact.” Eccon Constr. Co. v. Lucas, 221 Va. 786, 790, 273 S.E.2d 797, 799 (1981). Thus, the commission’s “finding upon conflicting medical evidence that a certain condition does or does not exist is ... a conclusive finding of fact.” McPeek v. P.W. & W. Coal Co., 210 Va. 185, 188, 169 S.E.2d 443, 445 (1969). “The deference that we give to the commission’s fact finding on medical questions is based upon the ‘unwisdom of an attempt by ... [courts] uninitiated into the mysteries [of the medical science debate] to choose between conflicting expert medical opinions.’ ” Stancill v. Ford Motor Co., 15 Va.App. 54, 58, 421 S.E.2d 872, 874 (1992) (citation omitted).
Robinson, 32 Va.App. at 5, 526 S.E.2d at 268-69.
Furthermore, the suggestion that the other evidence was “not equal” to the Program’s evidence lacks merit. When asked whether he rendered his opinions “to a reasonable degree of medical certainty,” Dr. VanDorsten expressly testified, “I do.” The record also indicates Dr. Lefton asserted *527 that he “h[e]ld the opinions [he has] stated ... to a reasonable degree of medical probability.” Dr. Hermansen likewise stated that his “opinions are expressed to a reasonable degree of medical probability.” Although Dr. Latimer did not couch her opinion in those express terms, her report contains no expressions of uncertainty or speculation. Her report, which we have quoted in detail earlier in this opinion, is prefaced with the following paragraph:
I am a Board Certified Child Neurologist. It is within the scope of my training and practice to evaluate and treat neonates in the intensive care nursery who have sustained neurologic injury. It is also within my scope of practice to determine timing and causation of injury and routine to read radiologic studies on these patients. I have reviewed prenatal and delivery records of Michele Bakke, neonatal intensive care unit ... records on [the infant], films of ultrasound studies performed on [the infant] ..., MRI studies ..., and subsequent records of her treating physicians and healthcare providers. In addition, I examined [the infant] in my office on July 16, 2003. In this light these are my findings.
Dr. Latimer’s report was competent medical evidence that the commission weighed with other medical evidence and accepted as persuasive. When a physician’s opinion is certain and accepted by the commission, this Court “will not substitute form over substance by requiring a physician to use the magic words ‘to a reasonable degree of medical certainty.’ ” Island Creek Coal Co. v. Breeding, 6 Va.App. 1, 11-12, 365 S.E.2d 782, 788 (1988). Indeed, in Lindenfeld v. City of Richmond Sheriff's Office, 25 Va.App. 775, 492 S.E.2d 506 (1997), we affirmed the commission’s decision to deny benefits to a claimant who suffered from tuberculosis, which he alleged he contracted while working at the jail. The record contained the opinions of three physicians regarding the causation of the disease, only one of which was an opinion “to a reasonable degree of medical certainty that [the] claimant contracted tuberculosis while working in the jail.” Id. at 781, 492 S.E.2d at 509. Noting that the commission found more persuasive *528 the opinion of the two physicians who did not use these words, we held that “the commission, as the trier of fact,” was permitted “to assign ... little weight” to the opinion of the other physician in resolving the claim under Code § 65.2-401. Id. at 786, 492 S.E.2d at 512. Since our decision in Bindenfeld, the legislature has amended Code § 65.2-401 to delete the requirement to prove the evidence “to a reasonable degree of medical certainty.”
Simply put, the Program presents a view of the evidence consistent solely with the testimony and reports of those physicians the commission found to be less persuasive. The fallacy in the Program’s analysis is demonstrated by its argument that “[b]ecause the Full Commission made no assertion that [the deputy commissioner’s] determinations of fact were plainly wrong, the Full Commission’s reversal of those factual findings was arbitrary and capricious and erroneous as a matter of law.” It is well settled that the commission is the finder of fact. When the commission “articulate[s] a basis for its conclusion ... that ... is supported by credible evidence in the record,” we are bound by its finding, not a contrary one made by the deputy commissioner. Goodyear Tire & Rubber Co. v. Pierce, 9 Va.App. 120, 127, 384 S.E.2d 333, 337 (1989). See also Grayson County School Bd. v. Cornett, 39 Va.App. 279, 286 n. 2, 572 S.E.2d 505, 508 n. 2 (2002); Lanning v. Va. Dept. of Trans, 37 Va.App. 701, 709, 561 S.E.2d 33, 37 (2002); Bullion Hollow Enterprises, Inc. v. Lane, 14 Va.App. 725, 728-29, 418 S.E.2d 904, 907 (1992); Williams v. Auto Brokers, 6 Va.App. 570, 573-74, 370 S.E.2d 321, 323-24 (1988). Even in cases, unlike this one, where the deputy commissioner makes credibility findings based on a witness’ demeanor, that finding is not unreviewable by the commission. Lane, 14 Va.App. at 729, 418 S.E.2d at 907. By statute, a request for review empowers the commission to consider the case de novo. Code § 65.2-705.
We hold, therefore, that credible evidence in the record supports the commission’s conclusion that the Program failed to rebut the presumption.
*529 C.
Although unnecessary in light of our holding, we address for completeness the Program’s contention that the evidence “established by a preponderance that uteroplacental insufficiency was the specific non-birth related cause of this infant’s cerebral palsy.” It argues that Dr. Christmas’s testimony and the other medical evidence support this conclusion.
The commission specifically addressed this aspect of Dr. Christmas’s testimony. It found that “[a]lthough Dr. Christmas opined that [the infant] suffered a hypoxemic event resulting from uteroplacental insufficient and resulting in PVL, he acknowledged that there was no evidence based on fetal monitor tracings showing that [she] suffered a neurologic injury before her birth.” The commission also noted that Dr. Christmas “agreed that there was no evidence of any acute trauma or infection in the uterus during ... Bakke’s pregnancy and could not identify precisely when [the infant’s] injury occurred before her delivery.”
A review of Dr. Christmas’s testimony and the reports supports these findings. In addition, the commission considered and weighed Dr. VanDorsten’s assessment of this specific testimony of Dr. Christmas and his conclusion that Dr. Christmas’s testimony was “way off base.” As we have repeated throughout, “[i]t was peculiarly within the province of the Commission to decide what evidence, if credible, was entitled to greater weight.” McPeek, 210 Va. at 188, 169 S.E.2d at 445, and, if a portion of the medical evidence “is in conflict with other medical evidence, the Commission is free to adopt that view ‘which is most consistent with reason and justice,’ ” Robinson, 32 Va.App. at 5, 526 S.E.2d at 269 (citations omitted).
V.
For these reasons, we affirm the commission’s award.

Affirmed.