COURT OF APPEALS OF VIRGINIA


Present:   Judges Frank, Kelsey and Senior Judge Coleman
Argued at Richmond, Virginia


CENTRAL STATE HOSPITAL/
  COMMONWEALTH OF VIRGINIA
                                              MEMORANDUM OPINION[*] BY
v.       Record No. 1720-07-2                 JUDGE SAM W. COLEMAN III
                                                    MARCH 25, 2008
ASHLEY M. BECKNER


            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

              Scott John Fitzgerald, Senior Assistant Attorney General
              (Robert F. McDonnell, Attorney General; Maureen Riley Matsen,
              Deputy Attorney General; Peter R. Messitt, Senior Assistant
              Attorney General, on brief), for appellant.

              Gerald G. Lutkenhaus (The Law Office of Gerald Lutkenhaus, on
              brief), for appellee.


        Central State Hospital/Commonwealth of Virginia (CSH) appeals from a decision of the

Workers' Compensation Commission awarding benefits to Ashley M. Beckner finding she

proved by clear and convincing evidence that her Methicillin-Resistant Staphylococcus Aureus

(MRSA) infection constitutes a compensable ordinary disease of life under Code § 65.2-401.

Because we conclude that the commission applied the correct burden of proof and that its

findings are supported by credible evidence, to which we must defer, we affirm the

commission's decision.

        There is no dispute that Beckner's MRSA infection constitutes an ordinary disease of life.

              For an ordinary disease of life to be compensable under
              § 65.2-401, a claimant must prove by "clear and convincing
              evidence, (not a mere probability)," that the disease (1) "arose out

────────────────────

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

of and in the course of [her] employment as provided in Code § 65.2-400"; (2) "did not result from causes outside of the employment"; and (3) "follows as an incident of occupational disease . . . [;] is an infectious or contagious disease contracted in the course of [specified types of employment]; or . . . is characteristic of the employment and was caused by conditions peculiar to such employment." Code § 65.2-400(B) provides that a disease arises out of the employment "if there is[, *inter alia*,] . . . [a] direct causal connection between the conditions under which work is performed and the occupational disease; . . . [and] [i]t can be fairly traced to the employment as the proximate cause . . . ."

Evidence is clear and convincing when it produces in the fact finder "'a firm belief or conviction as to the allegations sought to be established. It is . . . more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and *unequivocal*.'"

The commission's determination regarding causation is a finding of fact. A finding of causation need not be based exclusively on medical evidence, and *a claimant is not required to produce a physician's medical opinion in order to establish causation*. Causation of a medical condition may be proved by either direct or circumstantial evidence, including medical evidence *or* "the testimony of a claimant."

In determining whether credible evidence exists to support the commission's findings of fact, "the appellate court does not retry the facts, reweigh . . . the evidence, or make its own determination of the credibility of the witnesses." When the commission makes an award of benefits, unless we can say as a matter of law that claimant failed to sustain her burden of proving causation, the commission's findings are conclusive.

Tex Tech Indus., Inc. v. Ellis, 44 Va. App. 497, 503-04, 605 S.E.2d 759, 761-62 (2004) (citations

omitted). If credible evidence supports the commission's determination, we are bound by it

notwithstanding the fact that evidence may exist which supports a contrary finding. Morris v.

Badger Powhatan/Figgie Int'l, Inc., 3 Va. App. 276, 279, 348 S.E.2d 876, 877 (1986).

We view the evidence on appeal in the light most favorable to Beckner, the prevailing

party before the commission. See Clinchfield Coal Co. v. Reed, 40 Va. App. 69, 72, 577 S.E.2d

538, 539 (2003). So viewed, the evidence showed that Beckner began working for CSH on

- 2 -

September 10, 2005. Prior to that date, she was healthy and had never experienced symptoms of MRSA or been diagnosed with a MRSA infection. She had previously worked in a hospital setting as an emergency room registrar and an EKG technician, but left that employment in April 2005, approximately five months before starting work at CSH. In addition, she was not aware of any patients that she came into contact with in her previous job as having MRSA. That hospital tested all patients for MRSA, and if a test came back positive, it notified employees who had engaged in contact with that patient. Beckner never received notification that she had contact with a MRSA infected patient while working at that hospital.

Beckner also denied having taken any antibiotics in October 2005, being hospitalized during the period before October 2005, having any open sores or wounds, or being treated for any respiratory infection in October 2005, prior to her MRSA diagnosis. At that time, she was living with her boyfriend, who had never been diagnosed with MRSA and did not have any signs or symptoms of a MRSA infection. Beckner admitted she had several body piercings, which she obtained in 2002 or 2003. Those piercings did not lead to a MRSA infection at that time.

Around October 15, 2005, two to three weeks after she started working directly with patients at CSH, Beckner noticed large boils on her arms. She denied ever having these boils before that date. She received medical treatment at Healthcare Plus, where a culture was taken. According to Beckner, two days later, at her appointment with her treating physician, Dr. James Ross, he told her she had MRSA and that she "probably got it from [CSH]." When questioned about her contact with patients at CSH, Beckner stated they constantly grabbed or touched her bare arms and also touched her clothed shoulders. She came into contact with approximately twenty mental health patients on the ward, all of whom had very poor hygiene. Some of them urinated and defecated on themselves. After Beckner's MRSA diagnosis, CSH asked her to identify three patients who she believed might have MRSA. Diane Crawford, BSN, RN, CIC, an

- 3 -

infection control professional employed by CSH, reviewed the charts for those three patients, and reported that she "found no documentation of active MRSA during the time [Beckner] . . . specified exposure, nor was there an outbreak among patients or staff." No evidence showed that the other patients' charts were reviewed or that any testing for MRSA was performed by CSH.

On November 7, 2005, Dr. Ross, board certified in internal medicine and preventative medicine, wrote in an office note that Beckner's "abscesses, [which grew MRSA], were hospital-acquired." Subsequently, Dr. Ross opined, based on information from the Center for Disease Control (CDC) regarding MRSA, coupled with his treatment of Beckner, that "it is more likely than not" that she "acquired MRSA at [CSH]." Dr. Ross pointed out that it was not necessary for a patient to have an active MRSA infection in order to transmit the disease to Beckner. Dr. Ross cited CDC information on the significantly increased prevalence of MRSA in hospital settings and that specific patient populations with poor hygiene present a higher risk.

In a June 10, 2006 letter to Beckner's counsel, Dr. Rebecca A. Littaua, an infectious disease specialist, who also treated Beckner, expressly stated that Beckner's MRSA infection was "*most* likely" acquired while working at CSH. (Emphasis added.) In doing so, Dr. Littaua noted that

> Ms. Beckner had been exposed to many patients and their environment during her work in that facility, and it is known that person-to-person or contact transmission is the usual mode of spread for S. aureus infections. Prior to her work in CSH, she was healthy and she denied contact with anyone who was ill. But within a two-week period after starting her work in CSH, she started developing furuncles that quickly spread to her extremities.

In response to a questionnaire from Beckner's counsel in August 2006, Dr. Littaua, addressing the requirements for compensability under Code § 65.2-401, opined within a reasonable degree of medical probability that Beckner's exposure to the patients and work

conditions at CSH was the proximate cause of her MRSA infection. Dr. Littaua agreed that a "direct causal connection" existed between the conditions under which Beckner worked at CSH and the MRSA disease she was diagnosed with on October 18, 2005. Dr. Littaua opined that Beckner's MRSA was a natural incident of the work she performed at CSH. Dr. Littaua noted the common incubation period for MRSA is four to ten days, and that incubation period supported her opinion that the source of Beckner's MRSA infection was her employment at CSH and her exposure to over twenty mental health patients in the weeks preceding her diagnosis. Dr. Littaua agreed that Beckner's MRSA was more likely than not acquired at CSH from exposure by person-to-person contact with mental health patients, their clothing, or hospital equipment. Dr. Littaua opined with a reasonable degree of medical probability that MRSA is an infectious or contagious disease that Beckner contracted during the course of her employment at CSH from September 10 to October 18, 2005. Dr. Littaua agreed that MRSA is a disease characteristic of employment in a mental health hospital like CSH and was caused by conditions peculiar to such employment. Dr. Littaua opined within a reasonable degree of medical probability that Beckner was not exposed to MRSA outside her employment at CSH prior to her diagnosis. Dr. Littaua agreed that Beckner's previous employment, which ended in April 2005, was not the source of her MRSA infection. Dr. Littaua concurred with Dr. Ross's opinion that MRSA is far more prevalent in institutional settings than the community, that Beckner was exposed to many mental health patients who had problems with hygiene at CSH, and that she more likely than not acquired MRSA at CSH.

In its opinion, the commission acknowledged in unambiguous terms its understanding of the clear and convincing evidence standard as the degree to which it must be persuaded as fact finder that Beckner sustained her burden of proving the required elements, including causation, under Code § 65.2-401. Then the commission, in its role as fact finder, weighed the evidence

- 5 -

and accepted, as credible, the opinions of Drs. Ross and Littaua as to causation, while rejecting Crawford's opinion, noting as follows:

> Dr. Ross and Dr. Littaua agree that the claimant more likely than not contracted the infection at [CSH]. Dr. Ross specifically referred to the infection as hospital acquired, and Dr. Littaua addressed the required causal elements contained in the statute, concluding that the elements have been established. Both physicians provided detailed explanations for their opinions relating to the general risk of contracting the disease and to the claimant's specific case. A nurse [Crawford] employed by the defendant in this case issued the opposing opinion. We find the treating physicians' opinions more persuasive.

We are bound by the commission's resolution of the conflicting medical opinions. See Penley v. Island Creek Coal Co., 8 Va. App. 310, 318, 381 S.E.2d 231, 236 (1989). Thus, the dispositive question on appeal is whether we can say as a matter of law that the evidence taken as a whole, not in isolation, including the expert medical opinions and reports of Drs. Ross and Littaua and claimant's testimony, which a majority of the commission found credible, coupled with any other direct or circumstantial evidence and the reasonable inferences deducible therefrom, failed to support the commission's finding that Beckner proved by clear and convincing evidence that her MRSA infection constituted a compensable ordinary disease of life under Code § 65.2-401.

Here, Dr. Littaua initially opined that Beckner's MRSA was "most likely" acquired while working at CSH, using the word "most" to modify "likely." We have held that "the addition of the word 'most' to [an expert medical] opinion change[s] its meaning considerably. The adverb 'most' means '[i]n or to the highest degree' and is '[u]sed with many adjectives and adverbs to form the superlative degree [as in] *most honest* [or] *most impatiently*.'" Lee County Sch. Bd. v. Miller, 38 Va. App. 253, 263, 563 S.E.2d 374, 379 (2002) (quoting The American Heritage Dictionary of the English Language 1178 (3d ed. 1992)) (held commission could reasonably conclude a physician's opinion that claimant's carpal tunnel syndrome was "*most probably*

- 6 -

secondary to [the] cumulative effect of several years duration involving repetitive lifting, rotating, bending, and use of wrists" met "the standard required to prove a proposition by clear and convincing evidence"). Here, as in Miller, the commission "could reasonably conclude that Dr. [Littaua], by combining the adverbs 'most' and '[likely],' expressed [her] opinion regarding the cause of [Beckner's MRSA infection] as 'a firm belief or conviction,' the standard required to prove a proposition by clear and convincing evidence." Id. Moreover, "[w]hen a physician's opinion is certain and accepted by the commission, this Court 'will not substitute form over substance by requiring a physician to use . . . magic words . . . .'" Commonwealth v. Bakke, 46 Va. App. 508, 527, 620 S.E.2d 107, 116 (2005) (referring to the "reasonable degree of medical certainty" standard).[1]

Dr. Littaua's opinion that Beckner's MRSA was "most likely" acquired at CSH, coupled with her remaining opinions and reports, Dr. Ross's opinions and reports, and the record as a whole, including Beckner's testimony, could reasonably provide the commission, as fact finder, with a firm belief that the primary source of Beckner's MRSA infection was her employment at CSH and that her MRSA was directly and proximately caused by that employment. "As we previously have held, the requirement that a claimant establish the source of the disease means she must point 'not to a single source [of the disease], to the complete exclusion of all other sources, but to the primary source . . . .'" Miller, 38 Va. App. at 261, 563 S.E.2d at 378 (quoting Ross Labs. v. Barbour, 13 Va. App. 373, 377, 412 S.E.2d 205, 208 (1991)).

The two treating physicians explained why they found a "direct causal connection" between Beckner's MRSA and her CSH employment, such as the incubation period for the MRSA infection, its institutional nature, her considerable exposure to nonhygienic patients, and

---

[1] In Lanning v. Va. Dep't of Transp., 37 Va. App. 701, 709, 561 S.E.2d 33, 37 (2002), we noted that "[w]e cannot affirm a decision that emphasizes the use of one word to the exclusion of considerations of the context within which the word is used and other evidence in the record."

her limited social contact with other individuals.  Accordingly, their opinions and the underlying facts and circumstances that supported their opinions that Beckner's MRSA "*most* likely" was caused by her employment were sufficient for the commission, as a rational fact finder, to form "a firm belief or conviction" as to the cause of her MRSA.

We find CSH's reliance on Lindenfeld v. City of Richmond Sheriff's Office, 25 Va. App. 775, 492 S.E.2d 506 (1997), misplaced.  Lindenfeld, unlike this case, dealt with the pre-1997 language contained in Code § 65.2-401 requiring clear and convincing evidence "to a reasonable degree of medical certainty."  Furthermore, Lindenfeld involved the commission's denial of a claim based upon its resolution of conflicting medical evidence and its weighing of the remaining evidence in the record.  In Lindenfeld, in order to overturn that award on appeal, we had to find as a matter of law that Lindenfeld's evidence sustained his burden of proof.  Here, the commission awarded benefits to Beckner based on its weighing of the evidence, which we also must affirm, unless we can say as a matter of law that she failed to sustain her burden of proof.  As in Lindenfeld, we were required to defer to the fact finder and, we are required to do the same here.

Accordingly, we affirm the commission's decision.

Affirmed.