COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Chief Judge Decker, Judges Malveaux and Duffan


ANTONYA HERRING

                                                         MEMORANDUM OPINION* BY
v.        Record No. 0257-25-1                           JUDGE KEVIN M. DUFFAN
                                                         FEBRUARY 24, 2026

DBHDS/CENTRAL STATE HOSPITAL, ET AL.


             FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

             (Daniel Renfro; Renfro & Renfro, PLLC, on brief), for appellant.

             (Jason S. Miyares,[1] Attorney General; Thomas L. Sanford, Deputy
             Attorney General; Jacqueline C. Hedblom, Senior Assistant Attorney
             General/Trial Section Chief; Scott John Fitzgerald, Senior Assistant
             Attorney General, on brief), for appellee.


        Antonya Herring appeals the decision of the Workers' Compensation Commission

denying her claim for permanent total disability benefits based on a head injury she sustained

while working as a nurse.  The Commission concluded that Herring failed to prove she had

sustained a brain injury "so severe as to render [her] permanently unemployable in gainful

employment" under Code § 65.2-503(C).  We affirm because there is credible evidence in the

record to support the Commission's decision.[2]

_____

        * This opinion is not designated for publication.  See Code § 17.1-413(A).

        [1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

        [2] Having examined the briefs and record in this case, the panel unanimously holds that
oral argument is unnecessary because "the facts and legal arguments are adequately presented in
the briefs and record, and the decisional process would not be significantly aided by oral
argument."  See Code § 17.1-403(ii)(c); Rule 5A:27(c).

BACKGROUND

In October 2012, a patient at Central State Hospital attacked Herring while she was working as a nurse. The patient struck Herring with his fists on her face, the back of her head, and her shoulders. The Commission granted her temporary total disability benefits and lifetime medical benefits in November 2012 for a facial/head contusion, lacerations to the right side of her mouth, a right shoulder contusion, and post-traumatic headache.

Herring filed a claim seeking permanent total disability benefits in April 2022. She also sought to add post-traumatic stress disorder (PTSD) as a compensable consequence of her injuries and claimed that she suffered a concussion and/or traumatic brain injury from the accident. She submitted medical records along with her claim.

Herring was initially treated at CJW Chippenham Medical Center's Occupational Medicine facility. Her physician at CJW referred her for a neurological evaluation based on her reports that she was experiencing persistent headaches approximately a month after the accident. In December 2012, neurologists at Virginia Commonwealth University Medical Center (VCU) diagnosed her with post-traumatic headaches. Beginning with that 2012 report, Herring reported experiencing other symptoms, including insomnia, night terrors, memory difficulties, cognitive difficulties, and occasional dizziness.

Herring received regular neurological treatment, as well as limited instances of vestibular therapy and speech-language therapy. Her symptoms improved somewhat but did not fully resolve. In November 2014, she was diagnosed with a "closed traumatic brain injury." In January 2015, she was diagnosed with post-concussive syndrome with headaches, memory changes, and dizziness.

In March 2015, Dr. James B. Wade performed a neuropsychological evaluation and noted that Herring's scores were so inexplicably low and inconsistent on some of the intellectual

functioning tests that he could not rule out the possibility that Herring deliberately performed poorly on the tests. As Dr. Wade opined, the data "suggest[ed] a lack of effort and motivation in taking the neuropsychological measures," which could invalidate the test results. In fall 2017, a VCU neurologist determined that Herring had likely reached "maximum benefit from treatment," although she continued to experience memory disturbances and regular headaches. The treatment she received thereafter related primarily to managing her headaches, insomnia, and psychological symptoms. Herring told a neurologist in October 2019 that she still had "at least 15 headaches per month" and regular insomnia, but the neurologist was "not optimistic that after this many years from her injury" they could "make significant advances and management."

Herring also received psychological treatment from Dr. Mary Sciotto, a clinical psychologist, beginning in 2016. In a May 2018 letter, Dr. Sciotto explained that she treated Herring for PTSD and various related symptoms, including anxiety, depression, difficulty concentrating, hypervigilance, nightmares, fear of being around others, anger, and frustration. Dr. Sciotto noted that "PTSD is a difficult to treat and recalcitrant disorder, often causing symptomology which lasts for the lifetime of the patient." In a July 2019 letter, Dr. Sciotto noted that her treatment of Herring was limited to psychological symptoms, rather than physiological illness or injury.

Dr. Ronald S. Federici, a licensed clinical psychologist, conducted a neuropsychological evaluation of Herring in late 2021. Dr. Federici tested Herring's intellectual-cognitive functioning, attention, concentration, visual-spatial, perceptual, language, and expressive abilities. He found that Herring performed poorly in each of these areas and noted that she "was confused on simple attention, learning, and academic tasks and has very limited academic potential at this time." According to Dr. Federici, Herring "struggled with visual-spatial and perceptual organization skills and had no functional memory or learning abilities. She was

clumsy in her gait and balance, in addition to being hypersensitive to noise, sights, and sounds." He further noted that Herring showed "a severe pattern of weaknesses in attention, memory, and learning with no functional executive skills" and that "[s]he [wa]s lost and confused on most every task and require[d] constant prompts and redirection, as well as additional time, as she move[d] towards an almost 'fugue' state when she [wa]s challenged with any type of learning or processing task."

Based on the testing, Dr. Federici concluded, "there is absolutely and unequivocally no question that Ms. Herring displays a pattern of generalized, diffuse Organic Brain Dysfunction/Static Encephalopathy related to a very severe Traumatic Brain Injury." He opined that Herring's "overall neuropsychological profile indicates a pattern of 'global reduction' from her pre-morbid cognitive and psychological profile, which was highly functional" before the injury, when she worked as a nurse. This global reduction included a "pervasive pattern of loss in attention skills; intellect and problem-solving capabilities; severe impairments in language (severe impairments in receptive and expressive abilities) in addition to a total reduction/loss in her overall academic abilities." Dr. Federici concluded that "Herring's intellectual-cognitive abilities fall in the Severely Impaired range as she is grossly impaired in receptive and expressive language." Finally, he noted that his testing indicated "no malingering or 'secondary gain' but more of an individual who is still aware that she has lost a great deal and is overwhelmed, frustrated, and in a pervasive state of depression and debilitating anxiety due to the loss of neurocognitive skills on a global level." He recommended that Herring be considered for a cognitive rehabilitation program for individuals with brain injuries.

Dr. Sciotto filled out an "Attending Physician's Statement" on the nature of Herring's "Long Term Disability" in March 2022. Dr. Sciotto noted that Herring had a "Class 3" level of mental/nervous impairment, meaning that she was "able to engage in only limited stress

- 4 -

situations and engage in only limited interpersonal relations (moderate limitations)." Dr. Sciotto also opined that Herring could not return to nursing but was "a suitable candidate for trial employment" in some other job. Dr. Sciotto noted on the form, however, that her recommendations were for "psychological purposes only" and that Herring's "neurological limitations may differ."

Dr. Raymond Decker, Herring's primary care physician, filled out the same "Attending Physician's Statement" in March 2022 and similarly opined that Herring could not return to nursing but could potentially do non-nursing work. He also concluded that Herring had a "Class 3" level of mental/nervous impairment.

Dr. Edward Peck, a licensed clinical psychologist, conducted an independent neuropsychological evaluation of Herring in March 2022. Dr. Peck opined that Herring did not meet the diagnostic criteria for a concussion or traumatic brain injury, and she required no further treatment related to the 2012 work incident. Dr. Peck noted that there was no initial diagnosis of a concussion and that "subsequent diagnosis of post concussion syndrome only gradually filtered into the record, along with a movement of migraine to post traumatic migraine and post TBI migraine." He also noted that in records prepared close to the time of the incident, Herring denied losing consciousness during the attack. For example, in December 2012, Herring "denie[d] losing consciousness" but stated that she had "felt dazed and confused" after the attack. Herring later told treating providers that she had lost consciousness after the attack. Finally, Dr. Peck agreed with Dr. Wade that several tests aimed at diagnosing malingering suggested that Herring was deliberately exaggerating her cognitive deficits.

Dr. Federici disagreed with Dr. Peck's evaluation. He prepared a statement asserting that Dr. Peck's evaluation was not sufficiently comprehensive but rather was limited to unreliable tests focusing on the possibility of malingering. In Dr. Federici's view, Dr. Peck's conclusion

- 5 -

about malingering was "unequivocally incorrect." Dr. Federici also found Dr. Peck's suggestion that Herring needed no further treatment to be "almost incomprehensible" given that Herring "is totally nonfunctional and unable to work since the incident due to severe cognitive deterioration, confusion, disorganization, regression in speech, language, and basic academics, no functional memory and learning, no functional executive skills, and profound PTSD, which has been consistently validated by a qualified psychologist in PTSD issues." Finally, Dr. Federici stated that Herring should be considered "chronically and permanently disabled."

At an evidentiary hearing before a deputy commissioner, Herring testified that she could not return to work because of the lingering symptoms of her brain injury. Additionally, she claimed that she could not "function well" due to a combination of memory loss, "noise sensitivity," "light sensitivity," and "cognitive sensitivity." She had "great difficulty" reading and writing. She testified that she also experienced psychological symptoms, such as excessive fear. She described the effects of her injury as "terrifying." She explained that she would lay down frequently, rarely left home, and had to rely on her family for support. She could not "tolerate being out" and would send her family to places on her behalf. She had a valid driver's license, however, and was able to drive. She also conceded that no court had appointed a guardian or conservator to handle her affairs, but stated that her "husband helps."

The deputy commissioner found that Herring had proved entitlement to permanent total disability benefits.[3] Central State Hospital then requested review, and the Commission reversed,

---

[3] The deputy commissioner initially issued an opinion denying Herring's claim. He concluded that Herring suffered PTSD because of the accident and that Herring had suffered a concussion and traumatic brain injury, but that her claim based on the concussion and/or traumatic brain injury was barred by the statute of limitations. Because the claim for permanent total disability was predicated upon a compensable brain injury, the deputy commissioner denied the claim.

Herring requested review, and the full Commission reversed the deputy commissioner's decision. The Commission found the concussion/traumatic brain injury claim was not time-barred and the claimant proved that she suffered a concussion and traumatic brain injury in

concluding that the evidence was insufficient to establish that Herring's brain injury rendered her unemployable in gainful employment.

The Commission reviewed the opinions provided by Dr. Sciotto, Dr. Decker, Dr. Peck, and Dr. Federici. The Commission found that, although Herring suffers persistent PTSD symptoms, "causing disability does not satisfy the terms of . . . Code § 65.2-503(C)," which requires proof of a compensable brain injury rendering a claimant permanently unemployable in gainful employment. Thus, the Commission did not find Dr. Sciotto's medical opinion "particularly probative of the issue before [the Commission]" because Dr. Sciotto's treatment of Herring related primarily to her PTSD diagnosis. Moreover, the Commission concluded that Dr. Sciotto's "opinions do not relate to the effects of [Herring's] brain injury" because Dr. Sciotto's recommendations were for "psychological purposes" rather than Herring's "neurological limitations." The Commission also noted that Dr. Sciotto had not found that Herring had any physical impairment and had classified Herring as having a "Class 3" level of mental/nervous impairment. Thus, the Commission concluded that Dr. Sciotto's opinions established only that Herring is partially incapacitated due to her PTSD.

The Commission found that Dr. Decker's statement "also provides little guidance," noting its similarity to Dr. Sciotto's statement. The Commission noted that Dr. Decker's report also "did not reference a diagnosis of a brain injury and did not specify whether [Herring] suffered any incapacity due to her brain injury." Dr. Decker and Dr. Sciotto both expressed opinions that Herring was totally disabled from working as a nurse, but not from "any other work." But neither report contained any explanations supporting those conclusions.

_____

the accident. The Commission remanded the case to the deputy commissioner to consider whether the evidence was sufficient to support an award of permanent total disability benefits. The deputy commissioner found that he did not need to take additional evidence to decide the issue, and neither party objected.

The Commission gave "little weight" to Dr. Peck's opinion because it was based in part on the "faulty premise" that Herring had not suffered a concussion or traumatic brain injury at all. The Commission found that premise to be belied by the medical records and noted that the Commission had previously decided that Herring had suffered a traumatic brain injury from the accident.

Next, the Commission found that Dr. Federici's opinions failed to "address this precise issue" being decided. According to the Commission, Dr. Federici did not specify whether Herring's permanent disability is total or partial, and he "did not specify whether [Herring] was unable to perform her pre-injury jobs or whether she was unable to perform any job." The Commission also noted that Dr. Federici's recommendation that Herring undergo a cognitive rehabilitation program implied that her symptoms could improve, and he did not elaborate upon whether the treatment would impact her ability to work. Ultimately, the Commission concluded that Dr. Federici's statements that Herring "should be considered 'chronically and permanently disabled' and that she has been 'unable to work' since the accident are not, without further explanation, sufficient to prove that she is permanently unemployable in any gainful employment." (Emphasis omitted).

The Commission further found that, although it was "persuaded that [Herring] has experienced a decline in her cognitive abilities since the accident," it disagreed with Dr. Federici's conclusion that Herring is "totally non[-]functional." The Commission pointed out that Herring could drive and provided "coherent testimony at [the] hearing." The Commission found these facts probative, although it noted that "these abilities may or may not translate into employability."

Because Dr. Federici was "the only expert who provided an opinion on the claimant's work capacity as it relates to her brain injury," the Commission found that the failure of his

reports to address the relevant issues was "significant." Thus, the Commission concluded that Herring had failed to prove that she is not employable in any gainful employment and reversed the deputy commissioner's decision.[4]

ANALYSIS

"An award of the Workers' Compensation Commission is 'conclusive and binding as to all questions of fact.'" *Med. Mgmt. Int'l & Travelers Indem. Co. of Am. v. Jeffry*, 75 Va. App. 679, 684 (2022) (quoting Code § 65.2-706). "Consequently, on appeal, 'we do not retry the facts before the Commission nor do we review the weight, preponderance of the evidence, or the credibility of witnesses.'" *Jeffreys v. Uninsured Employer's Fund*, 297 Va. 82, 87 (2019) (quoting *Caskey v. Dan River Mills, Inc.*, 225 Va. 405, 411 (1983)). If credible evidence or reasonable inferences drawn from the evidence "support the Commission's findings, they will not be disturbed by this Court on appeal, even though there is evidence in the record to support contrary findings of fact." *Id.* (quoting *Caskey*, 225 Va. at 411). "The fact that there is contrary evidence in the record is of no consequence if there is credible evidence to support the commission's finding." *Cafaro Constr. Co. v. Strother*, 15 Va. App. 656, 660 (1993) (quoting *Wagner Enters., Inc. v. Brooks*, 12 Va. App. 890, 894 (1991)).

A claimant has the burden to prove, by a preponderance of the evidence, her entitlement to permanent total disability benefits. *See Paramont Coal Co. Va., LLC v. McCoy*, 69 Va. App. 343, 349 (2018). To be entitled to benefits under Code § 65.2-503(C)(3), Herring was required to prove that her brain injury is "so severe as to render [her] permanently unemployable in gainful employment." Code § 65.2-503(C)(3).

---

[4] The Commission declined Central State Hospital's request to reconsider its findings that the brain injury claim was timely and that Herring proved she suffered a concussion and traumatic brain injury in the accident.

"[G]ainful employment is employment that is beneficial to both the worker performing the job, as well as the employer providing the opportunity." *Great N. Nekoosa Corp. v. Wood*, 37 Va. App. 54, 59 (2001). A finding that a claimant is employable in gainful employment must "consider the labor market and the motivations of a potential employer." *Id.* at 60. The term's definition "implies that the employer needs the employee as it would need any other employee to perform the tasks of the occupation." *Id.* at 61. To ignore such considerations "would swallow the rule such that any brain injury no matter how severe would be noncompensable if one employer were willing to hire an individual for non-business reasons, such as compassion." *Id.* at 60.

Thus, to be employable in gainful employment does not mean that "the individual could engage in 'any occupation whatsoever.'" *Id.* at 61 (quoting *Atl. Life Ins. Co. v. Worley*, 161 Va. 951, 959 (1934)). Rather, "[t]otal disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market." *Id.* (emphasis omitted). The focus of the test is "the probable dependability with which [the] claimant can sell his or her services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above crippling handicaps."[5] *Id.*

In this case, the Commission found the evidence insufficient to prove that Herring is permanently unemployable in any gainful employment. "'The probative weight to be accorded [medical] evidence is for the Commission to decide; and if it is in conflict with other medical

---

[5] In *Great N. Nekoosa Corp.*, this Court held that a claimant who suffered a severe brain injury was permanently unemployable in gainful employment despite his former employer offering him part-time employment as a work order processor. 37 Va. App. at 57-58, 62-63. The claimant performed fewer than half the job tasks required of the last employee in the position, often was unable to perform his assigned tasks, and worked 12 or fewer hours per week because of fatigue and headaches. *Id.*

- 10 -

evidence, the Commission is free to adopt that view "which is most consistent with reason and justice."'" *Ga.-Pacific Corp. v. Robinson*, 32 Va. App. 1, 5 (2000) (alteration in original) (quoting *C.D.S. Constr. Services v. Petrock*, 218 Va. 1064, 1070 (1978)). And "[a] question raised by conflicting medical opinion is a question of fact." *Allen & Rocks, Inc. v. Briggs*, 28 Va. App. 662, 672-73 (1998) (quoting *WLR Foods v. Cardosa*, 26 Va. App. 220, 230 (1997)).

Herring focuses primarily on Dr. Federici's opinions. Herring is correct that, when weighing medical evidence, we do not require "magic words" in physicians' reports. *McCoy*, 69 Va. App. at 360 (quoting *Commonwealth v. Bakke*, 46 Va. App. 508, 527 (2005)); *see id.* ("The relevant subsection of the Virginia Code does not require an expressly stated physician's opinion that a claimant's condition meets the criteria for permanent disability."). Thus, Dr. Federici's failure to specifically state that Herring is unable to work "any job" is not dispositive of the issue before us if his report otherwise provides evidence to conclude that Herring is permanently and totally disabled. But the Commission not only found Dr. Federici's report insufficient for its failure to address the precise relevant issues; it also discredited his conclusion that Herring is "totally non-functional."

In short, the severity of the picture painted by Dr. Federici's report is anomalous when compared with the rest of the record evidence. None of the neurology reports dating back to 2012 describe a person with the level of cognitive decline that Dr. Federici describes. In January 2014, for example, Herring reported that she was "not feeling as foggy or slow during [the] day," would go to the gym, and would do housework, at least for ten minutes at a time. And an August 2017 patient note indicates that "[f]unctionally, [Herring] is independent, getting out and driving and going to a gym." Dr. Decker and Dr. Sciotto both opined in 2022 that Herring was capable of doing work other than nursing. Even Dr. Sciotto's reports, despite describing Herring as suffering from severe emotional distress and various cognitive issues, do not depict a person who lacked all ability

- 11 -

to function.  Additionally, Dr. Wade and Dr. Peck raised questions about whether Herring was deliberately exaggerating her symptoms.  And, as the Commission noted, Herring could drive and provided coherent testimony.  There is little else in the record apart from Dr. Federici's report to support Herring's claim that she is totally, permanently disabled.[6]

It appears from the record that even if Dr. Federici had used the so-called "magic words" mirroring the language in Code § 65.2-503(C)(3), viewed as a whole, the record contains credible evidence to support the Commission's conclusion that Herring failed to prove she is unemployable in any gainful employment.

## CONCLUSION

The Commission was presented with a voluminous medical record as well as the opinions of four separate medical providers.  Despite finding certain aspects of each provider's opinion unpersuasive or not probative to the issues, the cumulative effect of all of the evidence presented supported the Commission's conclusion that Herring failed to prove she is permanently unemployable in a gainful employment.  Thus, the Commission's judgment is affirmed.

*Affirmed.*

---

[6] We also reject Herring's argument that the Commission failed to consider all the evidence.  Herring submitted over 1,000 pages of medical records; that the Commission did not expressly discuss each piece of evidence in its opinion does not mean that it failed to consider that evidence.  The only evidence Herring identifies with this assignment of error are the 2017 VCU report that Herring had reached "maximum benefit from treatment"—which may be relevant to the permanence of Herring's injuries but does not establish total disability—and Dr. Federici's report.  In any event, the existence of "contrary evidence in the record is of no consequence if there is credible evidence to support the commission's finding." *Strother*, 15 Va. App. at 660.